IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

KENNETH TYSON,

                    Plaintiff,                    Civil Action No.
                                                   9:17-CV-0874 (DNH/DEP)
        v.

JOSEPH VASILE and TODD COMPO,

                    Defendants.

_____

APPEARANCES:                              OF COUNSEL:

FOR PLAINTIFF:

KENNETH TYSON, *Pro Se*
15-A-2954
Elmira Correctional Facility
P.O. Box 500
Elmira, NY 14902

FOR DEFENDANTS:

HON. BARBARA UNDERWOOD                    TIMOTHY MULVEY, ESQ.
New York State Attorney General           Assistant Attorney General
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

*Pro se* plaintiff Kenneth Tyson, a New York State prison inmate, has commenced this action against two corrections employees stationed at the prison facility in which plaintiff was confined at the relevant times pursuant 42 U.S.C. § 1983 alleging the deprivation of his civil rights. Specifically, plaintiff asserts a First Amendment retaliation cause of action against defendants based on his claim that defendant Compo planted a weapon in his cell and issued plaintiff a misbehavior report concerning the matter, and defendant Vasile presided over an ensuing disciplinary hearing and found plaintiff guilty as charged, all allegedly in retaliation for plaintiff having previously filed grievances against other corrections employees.

Currently pending before the court is a summary judgment motion brought by defendants seeking the dismissal of plaintiff's remaining retaliation claims. In their motion defendants argue that no reasonable factfinder could conclude plaintiff's protected conduct bore a causal relationship to the alleged retaliatory acts, principally because defendants were not implicated in the grievances filed by plaintiff prior to defendants' alleged retaliatory acts. For the reasons set forth below, I recommend that defendants' motion be granted.

I.    BACKGROUND[1]

Plaintiff is a New York State prison inmate currently in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See generally* Dkt. No. 1. While he is now incarcerated elsewhere, at the times relevant to plaintiff's claims in this action he was confined in the Auburn Correctional Facility ("Auburn") located in Auburn, New York. *Id.*

According to the plaintiff, he made complaints about his "mail, food, pictures, & property being stolen" in November of 2016. Dkt. 1 at 3. On November 3, 2016, he filed a formal grievance complaining that Corrections Officer Gebroni, who is not a defendant in the action, discarded his mail. Dkt. No. 22-2 at 6; *see also* Dkt. No. 30-1 at 1. Plaintiff later submitted a grievance on April 6, 2017, claiming that his needs were being neglected by DOCCS medical staff, including "mainly Ms. Quirry." [2] Dkt. No. 22-3 at 3; *see also* Dkt. No. 30-1 at 1. In a post script to that grievance, plaintiff alleged that his mail had not been delivered in two weeks, but did not accuse a specific individual of misconduct. *Id.* On April

---

[1]    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in the non-movant's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

[2]    Ms. Quirry is not a defendant in this matter.

13, 2017, one week later, plaintiff filed a grievance against Corrections Officer Skelly, who is not a named defendant, claiming that the officer denied him access to a telephone. Dkt. No. 22-4 at 5; *see also* Dkt. No. 30-1 at 1. According to a declaration from Cheryl Parmiter, the DOCCS Inmate Grievance Coordinator at Auburn, the November 3, 2016, April 6, 3017, and April 13, 2017 grievances were the only ones filed by the plaintiff between the time of his transfer into Auburn in July 2015 and April 28, 2017. Dkt. No. 30.

In his complaint, plaintiff alleges that on April 28, 2017, defendant Compo planted a "can top" in his cell. Dkt. No. 1 at 3; Dkt. No. 22-5 at 1. According to plaintiff, defendant Compo thereafter issued him a false misbehavior report accusing him of possessing a weapon, and, as a result, plaintiff was placed in the facility's special housing unit ("SHU"). Dkt. No. 1 at 3. A Tier III disciplinary hearing concerning that misbehavior report was conducted by defendant Vasile on May 11, 2017.[3] Dkt. No. 22-

---

[3]    The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace*, 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes*, 143 F.3d at 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

5 at 1. Following the hearing, defendant Vasile found plaintiff guilty as charged and sanctioned him to, *inter alia*, ninety days of SHU confinement. *Id.*; *see also* Dkt. No. 1 at 4.

On July 7, 2017, defendant Vasile's hearing determination was reversed based upon a finding that the "circumstances surrounding the incident raise question to [sic] inmate's culpability."[4] Dkt. No. 1-1 at 4. *Id.* Plaintiff was released from SHU confinement on July 12, 2017, after serving seventy-five days of his ninety-day sentence. Dkt. No. 1 at 4.

## II.    PROCEDURAL HISTORY

Plaintiff commenced this action on or about August 9, 2017, by the filing of a complaint, accompanied by an application for leave to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1, 5. Following an initial review of plaintiff's complaint, pursuant to 28 US.C. §§ 1915(e), 1915A, District Judge David N. Hurd issued a decision and order granting plaintiff's IFP application and accepting the complaint for filing only to the extent that it asserted First Amendment retaliation causes of action against defendants Compo and Vasile.[5] Dkt. No. 7 at 13.

---

[4]    The records pertaining to the April 28, 2017, misbehavior report and the subsequent disciplinary hearing determination were expunged, following the reversal, and are therefore no longer available. Dkt. No. 22-6 at 4.

[5]    Other causes of action alleging that defendant Compo issued plaintiff a false misbehavior report, and that plaintiff's procedural due process rights were violated by

On January 23, 2018, following the close of discovery, defendants filed a motion for summary judgment in their favor, arguing that no reasonable factfinder could conclude, based on the record, that there was a causal connection between plaintiff's grievances and defendant Compo's planting of a weapon in his cell or defendant Vasile's disciplinary hearing determination. *See generally* Dkt. No. 22-6. Defendants' motion, to which plaintiff has not formally responded,[6] has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

---

defendant Vasile during the course of the disciplinary hearing, as well as claims brought against the Auburn Correctional Facility, were dismissed by District Judge Hurd in his initial order. Dkt. No. 7 at 6-13.

[6]     On January 29, 2018, following the filing of defendants' motion, the court received a seven-page submission from plaintiff. Dkt. No. 26. It is comprised of copies of grievances filed by him on November 3, 2016, April 3, 2017, and April 7, 2017, as well as various determinations related to those grievances. *Id.* The submission did not include a memorandum of law, a response to defendants' statement of undisputed material facts, or an affidavit as required by the local rules of practice for this court. N.D.N.Y. L.R. 7.1(a)(3).

III.   DISCUSSION

A.   Legal Standard Governing Motions for Summary Judgment

Summary judgment motions are governed by Rule 56 of the Federal

Rules of Civil Procedure. Under that provision, the entry of summary

judgment is warranted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247

(1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391

F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this

inquiry if it "might affect the outcome of the suit under the governing law."

*Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549,

553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence

is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of

demonstrating that there is no genuine dispute of material fact to be

decided with respect to any essential element of the claim in issue; the

failure to meet this burden warrants denial of the motion. *Anderson*, 477

U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial

burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B.    Plaintiff's First Amendment Retaliation Claim

In his complaint, plaintiff asserts a First Amendment retaliation claims against defendants arising from allegations that defendant Compo planted a weapon in his cell and defendant Vasile issued an unsubstantiated disciplinary hearing determination against him, both in response to his filing of grievances and making complaints against other Auburn employees. Dkt. No. 1 at 3-5. In support of their request for

dismissal, defendants argue that, because neither defendant was named or implicated in the grievances plaintiff filed before defendants' alleged retaliatory conduct occurred, no reasonable factfinder could conclude that there is a causal nexus between plaintiff's grievances and defendants' conduct. Dkt. No. 22-6 at 6.

When adverse action is taken by prison officials against an inmate based upon the inmate having engaged in conduct protected under the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). As the Second Circuit has repeatedly cautioned, however, because such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus, courts must approach such claims "with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *accord, Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003).

To establish a *prima facie* claim under section 1983 for unlawful retaliatory conduct, a plaintiff must demonstrate that (1) the conduct at issue was protected, (2) the defendants took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Garrett v. Reynolds*, No. 99-CV-2065, 2003 WL 22299359, at *4 (N.D.N.Y. Oct. 3, 2003) (Sharpe, M.J.).

Because defendants in this action contend only that the record does not support a factfinder's conclusion that there exists a causal connection between the plaintiff's protected conduct and defendants' alleged adverse actions, I have assumed, for the purposes of this motion, that plaintiff has established the first two elements of a First Amendment retaliation claim. With respect to the third element, concerning causation, when a retaliation claim is based upon an allegation that a defendant issued a false misbehavior report, "[t]he difficulty lies in establishing a retaliatory motive." *Barclay v. N.Y.*, 477 F. Supp. 2d 546, 558 (N.D.N.Y. 2007) (Hurd, J.). "[M]ore than mere conclusory allegations [regarding retaliatory motive] are

required in order to survive a summary judgment motion." *Barclay*, 477 F. Supp. 2d at 558 (citing *Colon*, 58 F.3d at 872)). The "[t]ypes of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, a finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Barclay*, 474 F. Supp. 2d at 558; *see also Rivera v. Goord*, 119 F. Supp. 2d 327, 339 (S.D.N.Y. 2000). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002).

In this case, according to plaintiff, defendant Compo allegedly planted a weapon in his cell on April 28, 2017, in retaliation for plaintiff having filed grievances and complained that his property was being stolen. Dkt. No. 1 at 3. Plaintiff also alleges that defendant Vasile retaliated against him for filing grievances by conducting a "falsified hearing" concerning the allegedly false misbehavior report issued by defendant Compo and sanctioned him to, *inter alia*, ninety days of SHU confinement. *Id.* at 3-4. The defendants were not named in those grievances, however, nor is there any record evidence tending to establish their knowledge of the grievances filed by the plaintiff in November 2016 and April 2017. Dkt.

No. 22-2 at 6; Dkt. No. 22-3 at 3; Dkt. No. 22-4 at 5. Although plaintiff alleges that defendant Vasile told him that he was going to find him guilty of the disciplinary charges "no matter what . . . because him & his staff says so," that comment – assuming its truth –  does not link defendants to plaintiff's grievances. Dkt. No. 1 at 4. Moreover, while the disciplinary hearing determination rendered by defendant Vasile concerning the misbehavior report issued by defendant Campo was ultimately reversed, that fact alone is not sufficient to lead a factfinder to conclude that defendants knew about the grievances filed by plaintiff in November 2016 and April 2017, complaining of the actions of other corrections officers, and were motivated by those grievances in carrying out their alleged retaliatory conduct.

In short, there is no evidence before the court from which a reasonable factfinder could conclude that retaliatory animus motivated either defendant Campo to issue a false misbehavior report against plaintiff or defendant Vasile to find him guilty following a disciplinary hearing. *See Mateo v. Dawn*, No. 14-CV-2620, 2016 WL 5478431, at *8 (S.D.N.Y. Sept. 28, 2016)[7] ("Plaintiff's claim is similarly handicapped by its

---

[7]     All unreported decisions cited to in this report have been appended for the convenience of the *pro se* plaintiff.

failure to allege or otherwise suggest that Defendants even knew of the complaints filed against other correction officers."); *Henson v. Gagnon*, No. 13-CV-0590, 2015 WL 9809874, at *14 (N.D.N.Y. Dec. 10, 2015) (Dancks, M.J.) *adopted by* 2016 WL 204494 (N.D.N.Y. Jan. 15, 2016) (Suddaby, C.J.) (holding that no reasonable juror could find a causal connection between the plaintiff's protected conduct and the defendant's alleged retaliatory act because there was no evidence showing that the defendant knew of the plaintiff's grievances at the time he rendered his disciplinary hearing determination). Accordingly, I recommend that defendants' motion be granted.

IV.   <u>SUMMARY AND RECOMMENDATION</u>

Because no reasonable factfinder could conclude, based on the evidence now before the court, that defendants' conduct was motivated by retaliatory animus, I find that defendants' motion for summary judgment should be granted.

Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 22) be GRANTED, and plaintiff's complaint be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.[8] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:     August 6, 2018
           Syracuse, New York

David E. Peebles
U.S. Magistrate Judge

---

[8]     If you are proceeding *pro se* and are served with this report and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report and recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

Case 9:17-cv-00874-DNH-DEP    Document 32    Filed 08/06/18    Page 15 of 47
Henson v. Gagnon, Not Reported in F.Supp.3d (2015)
2015 WL 9809874

2015 WL 9809874
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Bruce Henson, Plaintiff,

v.

Gagnon, et al., Defendants.

9:13-CV-0590 (GTS/TWD)
|
Signed December 9, 2015
|
Filed 12/10/2015

**Attorneys and Law Firms**

Bruce Henson, 09-A-1436, Upstate Correctional Facility,
P.O. Box 2001, Malone, New York 12953, pro se.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, The Capitol, Melissa A. Latino, Esq.,
Assistant Attorney General, of Counsel, Albany, New
York 12224, for Defendants.

*ORDER AND REPORT AND RECOMMENDATION*

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge

 **\*1** Plaintiff Bruce Henson commenced this *pro se*
civil rights action under 42 U.S.C. § 1983 asserting
claims arising out of his incarceration at Upstate
Correctional Facility ("Upstate"). [1] (*See generally* Dkt.
No. 1 [2].) A number of originally named defendants
and the majority of the claims asserted by Plaintiff
in his complaint were dismissed from the case by the
Hon. Glenn T. Suddaby, Chief United States District
Judge, on initial review done pursuant to 28 U.S.C. §§
1915(e) and 1915A. (Dkt. No. 10.) The sole remaining
claims are: (1) First Amendment retaliation claims
against Defendant Sergeant Brian Gagnon ("Gagnon")
and Corrections Officer Eric DuFrane ("DuFrane") for
allegedly planting evidence in his cell during a cell
search and filing a false Misbehavior Report against
Plaintiff based upon the planted evidence, and including
a factually unsupported smuggling claim in retaliation for
grievances he had filed against Upstate staff; (2) a First

Amendment retaliation claim against Hearing Officer
Don Haug ("Haug"), incorrectly sued as "Hough," based
upon Haug's decision and the penalty imposed by him
in Plaintiff's disciplinary hearing on the Misbehavior
Report; and (3) a claim for deliberate indifference against
former Upstate Superintendent David Rock ("Rock") for
failing to correct misconduct by his staff after receiving
reports disclosing it. *Id.* at 34–35.

This matter is now before the Court on the remaining
Defendants' motion for summary judgment pursuant
to Federal Rule of Civil Procedure 56. (Dkt. No. 40.)
Plaintiff has opposed the motion. (Dkt. No. 43.) For
the reasons that follow, the Court recommends that
Defendants' motion for summary judgment be granted.

## I. BACKGROUND

### A. Random Cell Frisk/Search Procedure at Upstate

According to Defendant Gagnon, he receives a list of
randomly selected cells to be frisked/searched for security
purposes on a daily basis and, in his role as Sergeant,
often directs corrections officers under his supervision to
conduct the cell searches and to report any concerns to
him. (Dkt. No. 40–4 at 11 4–5.) Gagnon receives the list of
cells to be searched in a memorandum from the Captain's
Office to the Watch Commander. *Id.* at ¶ 6. The day and
time of the searches is varied to prevent predictability,
which would be counterproductive to the searches. *Id.* at ¶
5. Plaintiff acknowledged in his deposition testimony that
random searches are done at every facility. (Dkt. No. 40–
5 at 13.)

 **\*2** Defendant Corrections Officer DuFrane has been
trained to do cell searches by the Department of
Corrections and Community Supervision ("DOCCS").
(Dkt. No. 40–3 at 11 3–4.) DuFrane, who conducts
multiple routine cell searches a week at the direction
of his supervisor, described the routine cell frisk/search
procedure in his Declaration. *Id.* at ¶ 7. In accordance
with DOCCS policy, DuFrane examines the cell for
contraband, including drugs, and weapons or items. *Id.* at
¶ 9. DuFrane also examines State and personal property
of the inmate for damage. *Id.* at ¶ 10.

For security purposes, DuFrane is required to examine
the bars, windows, locks/locking mechanisms, interior and
exterior walls, secure cabinets, vents, and lighting and
plumbing fixtures in the cell, because an inmate could hide

contraband in the lighting and plumbing. *Id.* at ¶¶ 11–12. As a part of the inspection, DuFrane looks at the security screws in the cover of the light in the cell and the screws in the doors. *Id.* at ¶ 13.

According to DuFrane, Special Housing Unit ("SHU") inmates have an exercise area outside of their cell which is controlled by DOCCS, and only a DOCCS official can open or close the exercise door. *Id.* at ¶¶ 14–15. The control panel to open and close the exercise door is covered by a steel plate secured by security screws, which are difficult to unthread in order to prevent an inmate from opening the panels to hide contraband or escape to the outside area. *Id.* at ¶¶ 16–17. Loosening of the screws generally requires a special security screwdriver. *Id.* at ¶ 17. However, DuFrane knows of many inmates who have removed the screws, despite the difficulty, and many more who have attempted to do so by unthreading them. *Id.* at ¶ 18. The integrity of the security screws is important to facility security, not only because if an inmate were to remove the screws he could open the exercise door, but because the inmate could gain access to the cavity behind the steel plate and use the space for contraband, and the screws could be used as a weapon or part of a weapon. *Id.* at ¶¶ 19–22.

### B. Random Cell Frisk/Search of Plaintiff's Cell on November 29, 2012

Plaintiff was transferred from the SHU at Coxsackie Correctional Facility to the SHU at Upstate on September 24, 2012. (Dkt. No. 43–1 at 4.) Plaintiff's cell, B–14 in SHU 8 Building, which he shared with his cellmate Edward Saldano ("Saldano"), was randomly selected to be frisked/searched for security purposes on November 29, 2012. (Dkt. No. 40–4 at ¶¶ 9–10.) Plaintiff and Saldano had been moved into the cell on October 25, 2012. (Dkt. No. 40–8 at 37.)

Gagnon was working the 2:00pm to 10:00pm shift on 8–Block on November 29, 2012, when he received the memorandum identifying the cells to be searched that day. (Dkt. No. 40–4 at ¶¶ 7–9 and 8.) Plaintiff's cell was included on the list. *Id.* at 8. Although according to Gagnon, he directed Defendant DuFrane to conduct the cell frisk/search that included Plaintiff's cell, (Dkt. No. 40–4 at ¶ 11,) Plaintiff claims that there were seven corrections officers, as well as Gagnon, present during the search.[3] (Dkt. No. 1 at 27–28.)

DuFrane informed Plaintiff and Saldano that he was going to search their cell and, in accordance with DOCCS policy, removed them from the cell to conduct the search. (Dkt. Nos. 1 at 27; 40–3 at ¶¶ 32–33.) During the search, DuFrane discovered that the steel plate covering the electronic mechanism that controlled the exercise door was missing a screw and that three other screws were loose. (Dkt. No. 40–3 at ¶ 34.) DuFrane was concerned with what he perceived to be a serious violation that threatened the safety and security of staff, inmates, and the public. *Id.* at ¶ 35. DuFrane was most troubled by the missing screw, which could have been used as an anchor for a dragline to pass contraband from one cell to another, or passed to another inmate who might have used it to make a weapon. *Id.* at ¶ 36.

**\*3** DuFrane also found ripped up State sheets which had been formed into draglines in the corner of Plaintiff's cell. *Id.* at ¶ 37. According to DuFrane, draglines are used to drag, fish, or throw contraband from one cell to another. *Id.* DuFrane, who given both the missing screw and the draglines, was concerned that Plaintiff had been passing contraband, or was intending to pass or receive contraband, immediately notified his area Supervisor Gagnon. *Id.* at ¶¶ 38–39. Upon being notified, Gagnon went to Plaintiff's cell and saw both the draglines and the missing and loose screws in the steel plate. (Dkt. No. 40–4 at ¶¶ 13–14.) Gagnon also considered it to be a very serious violation that threatened the safety and security of the facility. *Id.* at ¶ 15. According to Gagnon and DuFrane, Plaintiff had not told either one of them about the missing and loose screws or torn sheets prior to the search on November 29, 2012, although he was required to advise staff of both of those things. (Dkt. Nos. 40–3 at ¶¶ 49–50; 40–4 at ¶¶ 26–27.)

DuFrane drafted a Misbehavior Report, dated November 29, 2012, describing what he had seen and found in Plaintiff's cell. (Dkt. Nos. 40–3 at ¶¶ 42–43; 40–8 at 46.) In accordance with DOCCS policy, DuFrane took photographs of the draglines and steel plate with the missing and loose screws and attached them to the Misbehavior Report. (Dkt. Nos. 40–3 at ¶¶ 45–46; 408 at 47–48.) Gagnon signed off on the Misbehavior Report and endorsed the charges of smuggling in violation of 114.10, tampering with property in violation of 116.11, and property damage or loss in violation of 116.10. (Dkt. Nos. 40–4 at ¶ 24; 40–8 at 46.)

Plaintiff claims that DuFrane planted the evidence used to support the Misbehavior Report during the November 29, 2012, cell search. (Dkt. Nos. 1 at 42–43; 43 at ¶ 24.) In addition, he claims that DuFrane and Gagnon filed a Misbehavior Report that contained a smuggling claim for which there was no factual basis for the purpose of increasing the Tier level of the Report to Tier III. (Dkt. Nos. 1 at 42–43.) Plaintiff contends that they did so in retaliation for grievances filed against other corrections officers by Plaintiff, and a grievance Plaintiff's cellmate Saldano filed against DuFrane on or about October 27, 2012, regarding Saldano's failure to receive his underclothes for forty days of his confinement at Upstate. (Dkt. No. 1 at 24, 26, 42–43.)

### C. Hearing Before Defendant Haug on the Misbehavior Report

At the designation of the Superintendent at Upstate, Defendant Haug, Food Service Administrator at Upstate, serves as an impartial hearing officer for Tier III disciplinary hearings. (Dkt. No. 40–8 at ¶¶ 2–3.) Haug was appointed by the Superintendent to act as the impartial hearing officer at the disciplinary hearing on the Misbehavior Report prepared by DuFrane and endorsed by Gagnon *Id.* at ¶ 8–9. Prior to the hearing, Haug received the Misbehavior Report and attached pictures of the steel plate with the missing and loose screws and draglines found in Plaintiff's cell during the search. *Id.* at ¶¶ 12, 17–19.

According to Haug, he commenced Plaintiff's disciplinary hearing on December 6, 2012, and the hearing was concluded on January 4, 2013. *Id.* at ¶ 8. The hearing was conducted on December 6, 2012, December 20, 2012, and January 4, 2013. *Id.* at 14, 20, and 30. On the initial hearing date, Plaintiff brought up the smuggling charge and asked Haug what it was he was supposed to have smuggled. *Id.* at 18–19. Haug indicated they would deal with the smuggling issue when the hearing resumed. *Id.* Plaintiff brought up the smuggling charge again on January 4, 2013, noting that he was charged with smuggling even though the Misbehavior Report said nothing about smuggling. *Id.* at 36. No witness testimony was given on December 6, 2012. *Id.* at 14–19.

Corrections Officer Keleher testified at Plaintiff's request when the hearing resumed on December 20, 2012. (Dkt. No. 40–8 at ¶ 25 and 20–21.) Plaintiff claimed that no search had been conducted before he and his cellmate were moved into the cell on October 25, 2012, and he wanted Keleher to testify as the signator of the October 26, 2012, Cell Inventory Checklist, which Plaintiff claimed was a fake. (Dkt. Nos. 1 at 17–18, 20; 43 at 4; 43–1 at ¶ 27.) Plaintiff also claimed that his signature on the Checklist had been forged. *Id.* Presumably, Plaintiff was attempting to establish that there had been no search, and therefore no record of whether the screws were already missing and loose and there were already draglines made from sheets in the cell when Plaintiff and Saldano were moved in.

**\*4** Keleher testified regarding the October 26, 2012, Checklist prepared in connection with a cell search he had done on Plaintiff's cell, which indicated that there were no issues with the cell, *i.e.*, no contraband found or torn sheets. (Dkt. No. 40–8 at ¶ 20 and 49.) Keleher testified that the Checklist included both his and Plaintiff's signatures.[4] *Id.* at 20. When asked by Haug, Keleher testified that the inspection was done on October 26, 2012, because Plaintiff and his cellmate had to be in the cell at the time of the inspection. *Id.* at 22. Plaintiff disagreed, stating that the New York Code of Rules and Regulations and DOCCS Supervision Directive 4933 required that the inspection be done before inmates are moved into a cell. *Id.* at 23.

Plaintiff informed Haug that he needed the testimony of the movement officer regarding when Plaintiff had been moved into the cell, and Haug indicated he would "check on the movement thing" but would have to postpone the hearing again. *Id.* Plaintiff also requested that the SHU log and cell search logs and a videotape of the search on November 29, 2012, be provided to him. *Id.* at 26–28. Haug told Plaintiff there was no videotape that would show inside the cell. *Id.* at 28. When the hearing resumed on January 4, 2013, Haug gave Plaintiff a copy of the cell search log he had requested. *Id.* at 30. Haug also told Plaintiff that he had compared his handwriting sample with the signature on the October 26, 2012, Checklist and concluded that they were pretty close, and there was no reason to think someone else had signed it for him. *Id.* Plaintiff renewed his request that the movement officer be called to testify as to the exact date he moved into the cell in order to clarify that a cell search was not done the day he and Saldano moved in. *Id.* at 30. According to Plaintiff, the movement officer had testified at Saldano's disciplinary hearing that they were moved into the cell on October 25, 2012. (Dkt. No. 40–8 at 31.) Haug, who

noted that Keleher had not disputed Plaintiff's claim that he moved in on October 25, 2012, and had indicated that the inspection was not done before Plaintiff moved in but on October 26, 2012, did not call the movement officer as a witness at the hearing *Id.* at 31–32.

Plaintiff's cellmate Saldano was called to testify on January 4, 2013, at Plaintiff's request. *Id.* at 34. Saldano testified that at his disciplinary hearing, Keleher had testified that he did a cell inspection on October 26, 2012, prior to Saldano coming into the cell, and that the movement officer had testified that Plaintiff and Saldano had moved into the cell on October 25, 2012. *Id.* at 37. Saldano testified he knew for a fact that Keleher did not do a cell search before they moved in because while they were in the hallway, before they had been in the cell, Keleher opened the door and trashed up the garbage left in the cell by the former occupant and kicked it into the hall. *Id.* at 37–38.

At Haug's request, Gagnon also testified on January 4, 2013. *Id.* at 40. Haug showed Gagnon the Misbehavior Report and, presumably showing him the picture of the torn sheets, asked Gagnon if they were the sheets he took out of Plaintiff's cell. Gagnon answered in the affirmative and indicated that the sheets were piled in the corner of the cell. *Id.*

### D. Haug's Determination and Modification on Review

Haug issued a written decision on the charges in the Misbehavior Report on January 4, 2013. (Dkt. No. 40–8 at 42–43.) Haug found Plaintiff guilty of 114.10 smuggling, 116.10 property damage or loss, and 116.10 tampering with property. *Id.* Haug relied upon the Misbehavior Report written by DuFrane and sponsored by Gagnon; the October 26, 2012, Cell Inventory Checklist showing no damage and bearing what Haug had determined to be Plaintiff's signature; Keleher's testimony regarding a search having been done before Plaintiff entered the cell; Saldano's testimony that Keleher was in the cell before he and Plaintiff entered it; Gagnon's testimony that the sheets were found in the corner near the exercise pen; Plaintiff's failure to present evidence contradicting the testimony; and the invalidity of Plaintiff's objections. (Dkt. No. 40–8 at 42–43.)

**\*5** Haug imposed a penalty of nine months in SHU, three months loss of good time, and restitution in the amount of $13.00 for the two sheets and one pillow case.

*Id.* Haug's articulated rationale for the penalty was to act as a deterrent for future misconduct that could result in a more serious disposition. *Id.*

Plaintiff requested a discretionary review of Haug's determination by Defendant Superintendent Rock. (Dkt. No. 43–1 at 9.) Rock explained in his determination of January 9, 2013, that a superintendent's discretionary review looked at the charges and the penalty imposed, and that the superintendent had discretion to lower the amount of the penalty, which he declined to do. *Id.* On appeal to Albert Prack, Director SHU/Inmate Discipline, Prack modified Haug's determination by dismissing the 114.10 smuggling charge on the grounds that it could not be substantiated by the Misbehavior Report. (Dkt. No. 43–1 at 21–22.)

### E. Plaintiff's Retaliation Claim Against Haug

The sole claim against Haug that survived initial review is Plaintiff's claim that Haug's disciplinary hearing decision and penalty, which Plaintiff claimed were not based upon the evidence, were "vengeful" and in retaliation for grievances Plaintiff submitted against Haug prior to the completion of the disciplinary hearing. (Dkt. No. 1 at 8.) The first grievance against Haug, dated December 19, 2012, complained that Haug's false statement that he had to seek an extension on the disciplinary hearing on Plaintiff's Misbehavior Report because of an extensive witness list was retaliatory and vengeful and violated Plaintiff's constitutional rights because it kept him in SHU for a longer period of time. [5] (Dkt. No. 43–1 at 5–7.)

In the second grievance against Haug, dated December 21, 2012, Plaintiff reiterated his previous grievance against Haug regarding the allegedly false pretenses relied upon by Haug in seeking an extension on the disciplinary hearing. Plaintiff also complained about the escorting officers, including a claim that Haug looked to one of the escorting officers as if asking her for advice each time Plaintiff asked for pertinent pieces of evidence from the hearing officer, further showing Haug's bias and partiality. *Id.* at 25.

There is no evidence in the record that either of the grievances was filed with the Inmate Grievance Office at Upstate or acted upon by the Inmate Grievance Resolution Committee. According to Plaintiff's complaint, as of January 17, 2013, well after Haug

had issued the allegedly retaliatory decision and penalty, Plaintiff had yet to receive grievance numbers or any acknowledgment of receipt of the grievances dated December 19, 2012, and December 21, 2012, from the Inmate Grievance Program. (Dkt. No. 1 at 13.) Plaintiff allegedly complained to Rock that Sergeant Gravlin withheld the grievances Plaintiff filed against Haug until the conclusion of the disciplinary hearing so that he could then dismiss the grievances. *Id.* at 8, 41.

**\*6** Haug denies having had any knowledge during the hearing that Plaintiff had filed a grievance against him. (Dkt. No. 40–8 at ¶¶ 31–33.) Haug asserts that given his lack of knowledge, he was not influenced in any way by the grievance in rendering a decision and issuing a disposition in Plaintiff's disciplinary hearing. *Id.* at ¶ 34. According to Haug, he conducts numerous hearings each year, and "[t]he fact that a grievance may be filed against me by a disgruntled inmate, who is the subject of a disciplinary hearing over which I am presiding, does not affect my partiality in any manner, and in no way influences my disciplinary decisions." *Id.* at ¶ 35. Haug claims that he reasonably relied upon the hearing evidence in rendering his decision and defended his decision as supported by the evidence and the penalty imposed as reasonable and appropriate to the charges. *Id.* at ¶¶ 37–56. Haug contends that despite Prack's dismissal of the smuggling charge on appeal, it was reasonable, based on the hearing evidence, for Haug to find Plaintiff guilty of all of the charges in the Misbehavior Report. *Id.* at ¶¶ 58–61.

Plaintiff testified at his deposition that he "never grieved the hearing" because "there was no reason for [him] to file a grievance for the hearing because he appealed it." (Dkt. No. 40–5 at 14, 16.)

### F. Supervisory Claim Against Rock

Claims that former Upstate Superintendent Rock exercised deliberate indifference by failing to take corrective action after receiving, reviewing, and responding to complaints and letters regarding staff misconduct and other matters are spread throughout Plaintiff's complaint. Plaintiff has alleged that Rock failed to take action when Plaintiff complained about the operation of the grievance procedure in connection with a September 29, 2012, grievance filed by him against Corrections Officer Sevey ("Sevey") regarding Plaintiff's medical diet food trays. (Dkt. No. 1 at 9.) According to Plaintiff, Rock responded but took no action. *Id.* On

October 16, 2012, Plaintiff submitted another complaint to Rock regarding bias and the partial investigation done on the Sevey grievance. *Id.* at 21. On October 26, 2012, Rock denied the grievance which, according to Plaintiff, proved that the investigation had been suspect and biased. *Id.* In addition, Plaintiff complained to Rock regarding Sevey's alleged disposal of Plaintiff's library request forms under the direction of Sergeant Gravlin on January 5, 2013, thereby denying Plaintiff access to courts as needed. *Id.* at 8. Plaintiff also complained to Rock about F.O.I.L. Officer L. Demarse's intentional withholding of documentary evidence requested by Plaintiff regarding the deprivation order issued as a result of the November 29, 2012, cell search findings. *Id.*

Plaintiff has also alleged that he sent a complaint to Rock on November 16, 2012, expressing disappointment with the Progressive Inmate Movement System ("PIMS"). *Id.* at 10. Plaintiff was interviewed by Gagnon, who allegedly made a threatening comment, and no further action was taken. *Id.* On November 15, 2012, Plaintiff sent Rock another complaint regarding his disappointment with PIMS. *Id.* at 26. According to Plaintiff, Rock did nothing towards resolving the situation and advised Plaintiff to go through the grievance program. *Id.*

Plaintiff has alleged he authored another complaint, which was sent to Rock on November 28, 2012, because Sevey was purposely not giving him toilet tissue. *Id.* at 26–27. Plaintiff contends that he received the same response from Rock (presumably being told to go through the grievance procedure) despite letting Rock know the urgency of the situation. *Id.*

When in addition to filing a grievance, Plaintiff complained to Rock about the allegedly retaliatory cell search by DuFrane, false Misbehavior Report, and deprivation order by Gagnon, Rock again responded in the same way, with no resolution even after numerous complaints. (Dkt. No. 1 at 11–12, 28.) Plaintiff also complained to Rock about Haug's bias while the disciplinary hearing was ongoing, Haug's bias in imposing a penalty of nine months in SHU when it was not based on the evidence presented, and Sergeant Gravlin's actions in holding the grievances Plaintiff filed against Haug until the conclusion of the hearing so that he could then dismiss them. *Id.* at 8, 41.

**\*7** According to Rock, inmates file numerous grievances and complaints on a daily basis, and it was not typical for him to personally review or respond to all such complaints in his role as Superintendent. (Dkt. No. 40–6 at ¶ 7.) Rock often delegated investigations surrounding complaints of staff misconduct or conditions of confinement to his executive staff and fully relied upon their investigations and findings in the matters. *Id.* at ¶ 8. Complaints received regarding staff misconduct might be referred to the Deputy of Security of the Facility for review and investigation or to the Inspector General's Office if seemed appropriate. *Id.* at ¶ 9. As Superintendent, Rock also advised inmates to seek resolution through the Inmate Grievance Program, which was designed to provide an orderly, fair, and expeditious method of resolving complaints. *Id.* at ¶ 10. Rock would review the findings of those to whom he had given a complaint for investigation, and if it was determined that no evidence existed to support an inmate complaint, Rock would have no reason to believe any further action was required. *Id.* at ¶ 13.

Rock has no recollection of ever being made aware of any violation of Plaintiff's constitutional or federal rights. *Id.* at ¶ 15.

## II. APPLICABLE LEGAL STANDARDS FOR SUMMARY JUDGMENT MOTIONS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c)*; *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin,* 467 F.3d at 272–73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann,* 604 F.3d 72, 81 (2d Cir.2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist ....") (citations omitted).

In *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." "To defeat summary judgment, ... nonmoving parties "may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys,* 426 F.3d at 554 (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). Statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 452 (2d Cir.1999).

**\*8** In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to formal pleadings drafted by lawyers." *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003) (quoting *Haynes v. Kerner,* 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make

reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting rights merely because they lack a legal education. *Id.* (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). The court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). However, this does not mean that a *pro se* litigant is excused from following the procedural formalities of summary judgment, *Govan,* 289 F.Supp.2d at 295, and "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* No. 93 Civ. 5981(WHP)(JCF), 1999 WL 983876 at *3, 1999 U.S. Dist. LEXIS 16767 at *8 (S.D.N.Y. Oct. 28, 1999)[6] (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)). Moreover, the latitude accorded a *pro se* litigant "does not relieve him of the obligation to respond to a motion for summary judgment with sufficient admissible evidence." *Hamlett v. Srivastava,* 496 F.Supp.2d 325, 328 (S.D.N.Y.2007) (citing *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003)).

## III. ANALYSIS

### A. Deficiencies in Plaintiff's Opposition Papers

As required under N.D.N.Y. Local Rule ("L.R.") 7.1, Defendants have filed a statement of material facts with citations to the summary judgment record. (Dkt. No. 40–1.) Although Plaintiff has responded to the statement of material facts filed by Defendants (Dkt. No. 43–1 at 34–38), he has failed to do so in the manner required under L.R. 7.1(a)(3). Under the rule, the opposing party's response to the movant's statement of material facts "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." L.R. 7.1(a)(3).

Plaintiff's "Challenge to Statement of Facts" consists of challenges to and commentary on certain of Defendants' numbered statements of material fact, with citations to the record limited to Plaintiff's challenges to statements 45, 56, 60, 63, 75–76, 86, 89, 95, and 99. (Dkt. No. 43–1 at 34–38.) As to those, Plaintiff's citations are not to admissible evidence. Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the L.R. provides

that facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record,[7] and (2) the nonmovant, if proceeding *pro se,* has been specifically advised of the possible consequences of failing to respond to the motion.[8] *See Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996).

**\*9** The Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that "while a court is not required to consider what the parties fail to point out in their [local rule statements of material facts], it may in its discretion opt to conduct an assiduous review of the entire record even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001) (citation and internal quotation marks omitted). The Court has opted to review the entire record in this case. However, the Court's review has revealed that Plaintiff's opposition, consisting of unsigned commentary on Defendants' submissions and a number of documents, but no affidavits or declarations, contains very little in the way of admissible evidence. Moreover, since Plaintiff's complaint is not verified, it may not properly be treated as an affidavit in opposition to Defendants' motion.[9] (*See* Dkt. No. 1.)

### B. Exhaustion of Administrative Remedies on Plaintiff's Retaliation Claim Against Haug

Although it is not entirely clear, it appears that Defendant Haug may be arguing that he is entitled to summary judgment on Plaintiff's retaliation claim on the ground that Plaintiff failed to exhaust his administrative remedies with regard to the claim. (Dkt. No. 40–2 at 3.) Plaintiff has acknowledged that he did not file a grievance with regard to the hearing. (Dkt. No. 40–5 at 14, 16.) However, "[w]here an inmate's federal claims arise directly out of a disciplinary or administrative segregation hearing, ... (*e.g.*, a claim of denial of procedural due process), he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal." *Sweet v. Wende Correctional Facility,* 514 F.Supp.2d 411, 413 (W.D.N.Y.2007) (internal quotations omitted) (quoting *Rosales v. Bennett,* 297 F.Supp.2d 637, 639 (W.D.N.Y.2004)); *see also Harvey v. Harder,* No. 9:09–CV–154 (TJM/ATB), 2012 WL 4093792, at *4, 2012 U.S. Dist. LEXIS 132248, at *16 (N.D.N.Y. July 31, 2012) ("Generally, exhaustion of administrative remedies

involves utilizing the facility's grievance process, however, when an inmate's federal claims arise directly out of a disciplinary or administrative segregation hearing or confinement, he exhausts his administrative remedies by presenting his objections in the administrative appeals process.").

Plaintiff pursued an administrative appeal from Haug's decision. (Dkt. No. 43–1 at 21–22.) However, since Plaintiff's submission on that appeal is not included in the record, the Court cannot determine whether Plaintiff raised his retaliation claim in the appeal. Because failure to exhaust is an affirmative defense, a defendant bears the burden of showing by a preponderance of the evidence that a plaintiff has failed to exhaust his available administrative remedies. *See Murray v. Palmer,* No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at *4, 2010 U.S. Dist. LEXIS 32014, at *16 (N.D.N.Y. Mar. 31, 2010). Haug has not done so. Therefore, the Court recommends that summary judgment in his favor for failure to exhaust be denied.

### C. Retaliation Claims

To prevail on a First Amendment retaliation claim, an inmate must establish "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected speech [or conduct] and the adverse action." *Holland v. Goord,* 758 F.3d 215, 225 (2d Cir.2014) (quoting *Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir.2009)); *see also Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (quoting *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema,* 534 U.S. 506, 508 (2002)). "Adverse action" for purposes of a retaliation claim has been defined objectively as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Pidlypchak,* 389 F.3d at 381.

**\*10** An inmate bears the burden of showing that "the protected conduct was a substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). In evaluating whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, "a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory

act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002) (citing *Colon,* 58 F.3d at 873). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.* A showing of temporal proximity, without more, has been found insufficient to survive summary judgment. *See Roseboro v. Gillespie,* 791 F.Supp.2d 353, 370 (S.D.N.Y.2011) (citations omitted).

Even if a plaintiff makes the appropriate showing of retaliation, a defendant may avoid liability if he demonstrates that he would have taken the adverse action in the absence of the protected conduct. *See Scott v. Coughlin,* 344 F.3d 282, 287–88 (2d Cir.2003) ("Regardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show ... that even without the improper motivation the alleged retaliatory action would have occurred.") (citation omitted); *Roseboro,* 791 F.Supp.2d at 371.

Because of the relative ease with which claims of retaliation can be incanted, courts have scrutinized retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983), *overruled on other grounds, Swierkiewicz,* 534 U.S. 506. As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

*Dawes,* 239 F.3d at 491. Accordingly, claims of retaliation must be supported by specific facts; conclusory statement

are not sufficient. *Flaherty*, 713 F.2d at 13. Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.' " *Smith v. Woods*, No. 9:03–CV–480 (DNH/GHL), 2006 WL 1133247, at * 3 & n.11, 2006 U.S. Dist. LEXIS 29745, at * 14 n.11 (N.D.N.Y. Apr. 24, 2006) (quoting *Jeffreys*, 426 F.3d at 554–55), *aff'd.* 219 F. App'x 110 (2d Cir.2007).

### 1. Retaliation Claim Against DuFrane

Plaintiff claims that DuFrane planted evidence in his cell during a cell search, filed a false Misbehavior Report against him based upon the planted evidence, and added a factually unsupported smuggling charge in retaliation for grievances Plaintiff had filed against Upstate staff and a grievance Plaintiff's cellmate had filed against DuFrane. (Dkt. No. 1 at 24, 26, 42–43.)

The filing of grievances has been found to constitute protected First Amendment conduct for purposes of a retaliation claim. *See David v. Goord*, 320 F.3d 346, 352–53 (2d Cir.2003). Furthermore, the planting of evidence and issuance of a false misbehavior report based upon that evidence has been found to constitute adverse action for purposes of a retaliation claim. *See Pidlypchak*, 389 F.3d at 384 (filing a false misbehavior report constitutes adverse action); *Colon v. Coughlin*, 58 F.3d 865, 872–73 (2d Cir.1995) (finding adverse action where plaintiff alleged that prison officials had planted contraband in his cell); *Williams v. King*, 56 F.Supp.3d 308, 328 (S.D.N.Y.2014) (the alleged planting of contraband and allegedly disproportionate administrative actions that follow have been found serious enough to constitute adverse action for retaliation purposes); *Payne v. Axelrod*, 871 F.Supp. 1551, 1556 (N.D.N.Y.1995) (valid § 1983 retaliation claim stated where prisoner alleged that corrections officers planted contraband evidence in his cell and falsely charged him with possession).

**\*11** However, DuFrane has denied Plaintiff's claim that he planted evidence and filed a false misbehavior report. According to DuFrane, he was not asked by any corrections official to plant evidence in Plaintiff's cell or damage his exercise door by removing screws, and he did not have torn, ripped sheets with him or a special screwdriver to unthread the screws when he went to Plaintiff's cell to conduct a routine search. (Dkt. No. 40–3 at ¶¶ 56–57.) In addition, according to DuFrane, he had not been in Plaintiff's cell prior to the search, and he would not have had an opportunity to damage Henson's state owned property or the steel plate during the search as there is such limited access to the cell. *Id.* at ¶ 58. DuFrane contends that he acted in accordance with DOCCS policy when he found the damage in Plaintiff's cell by advising Gagnon, taking photographs, and drafting the Misbehavior Report that was approved by Gagnon. *Id.* at ¶ 59. Furthermore, while the Misbehavior Report does not appear to include facts clearly supporting the smuggling charge that was dismissed by Prack on appeal, the review officer left in the smuggling charge and designated the Misbehavior Report as a Tier III.[10] (Dkt. No. 40–8 at ¶ 6.)

The record is devoid of evidence, admissible or otherwise, that supports Plaintiff's conclusory assertion that he was framed by DuFrane, and that the Misbehavior Report was based upon evidence planted by DuFrane. *See Jeffreys*, 426 F.3d 554 (nonmoving parties may not rely on "conclusory allegations or unsubstantiated speculation" to defeat summary judgment). In his unsigned, unverified response to DuFrane's Declaration, Plaintiff claims that inmates have no access to the special screwdrivers DuFrane claimed were generally required to unthread the security screws. (Dkt. Nos. 40–3 at ¶ 17; 43–1 at 45.) However, according to DuFrane, he has known of many inmates who have removed security screws and others who have attempted to do so by unthreading them. (Dkt. No. 40–3 at ¶ 18.)

At his disciplinary hearing, Plaintiff attempted to defend against the charges in the Misbehavior Report by attacking the validity of the October 26, 2012, Cell Inventory Checklist indicating no contraband was found in the room and his signature, and claiming that the cell was not inspected prior to the time he and his cellmate were moved there on October 25, 2012. (Dkt. No. 40–8 at 17–18, 49.) However, Keleher testified that an inspection of Plaintiff's cell was done, and the October 26, 2012, Cell Inventory Checklist was valid. (Dkt. No. 40–8 at 20–22.) Furthermore, Plaintiff's cellmate Saldano testified that when he and Plaintiff were in the hallway before being allowed in the cell, Saldano saw Keleher open the door,

trash up the garbage left in the cell by the former occupant, and kick it in the hall. (Dkt. No. 40–8 at 37–38.) One could reasonably infer from Saldano's testimony that had there been draglines in the cell at the time, they would have been discovered and placed in the trash that Keleher kicked into the hall. Even if Plaintiff had been able to establish that there had been no search of the cell when Plaintiff moved in a month before the random frisk/search by DuFrane, that would not necessarily support an inference that the draglines and missing and loose screw were there when Plaintiff and his cellmate moved in. Furthermore, if they were, Plaintiff was required to report it to facility staff and did not. (Dkt. No. 40–3 at ¶¶ 49–50.)

 **\*12** Even if there were sufficient evidence to create an issue of material fact with regard the adverse action element of Plaintiff's retaliation claim, his claim against DuFrane falters on the third element, establishment of a causal connection between the protected conduct and the adverse action. *See Holland,* 758 F.3d at 225. There is no evidence in the record that Plaintiff himself had filed a grievance against DuFrane prior to the November 29, 2012, random frisk/search of his cell, and Plaintiff has conceded that his retaliation claim is based upon grievances he filed against other corrections officers and a grievance Saldano filed against DuFrane.

Plaintiff's exercise of his First Amendment rights was not involved in Saldano's filing of a grievance against DuFrane regarding Saldano's undergarments. Moreover, as a general matter, it is difficult to establish that a defendant had cause to retaliate against a plaintiff for filing a grievance against another party, in this case other corrections officers. *See Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when the only alleged basis for retaliation was a complaint about an incident involving another corrections officer); *Guillory v. Ellis,* No. 9:11–CV–600 (MAD/ATB), 2014 WL 4365274, at 18, 2014 U.S. Dist. LEXIS 120709, at \* 49 (N.D.N.Y. Aug. 28, 2014) ("it is difficult to establish one defendant's retaliation for complaints against another defendant"); *Roseboro,* 791 F.Supp.2d at 369 (failure by plaintiff to provide any basis to believe corrections counselor would retaliate for a grievance in which she was not personally named); *Ciaprazi v. Goord,* No. 9:02–CV–915 (GLS/DEP), 2005 WL 3531464, at \* 8–9, 2005 U.S. Dist. LEXIS 38232, at \* 22 (N.D.N.Y. Dec. 22, 2005) (granting summary judgment and dismissing retaliation

claim based only on plaintiff's conclusory allegations that the manifest falsity of the misbehavior report and testimony during the disciplinary hearing indicate the disciplinary matters were motivated by retaliatory animus due to grievances plaintiff filed against individuals other than the defendants involved in the disciplinary hearing).

As noted above, conclusory statements are not sufficient to support causation on retaliation claims; the claims must be supported by specific facts. *Flaherty,* 713 F.2d at 13. The record is devoid of evidence, admissible or otherwise, that supports Plaintiff's conclusory assertion that DuFrane planted evidence and issued the Misbehavior Report based upon evidence in retaliation for grievances Plaintiff had filed against other corrections officers. DuFrane states in his Declaration that he was not the subject of any grievance filed by Plaintiff at the time of the cell search. (Dkt. No. 40–3 at ¶ 55.) DuFrane does not work closely with the Inmate Grievance Program and would not be aware of how many grievances Plaintiff had filed against other corrections officers prior to November 29, 2012. *Id.* at ¶ 52. Moreover, according to DuFrane, it was of no concern to him whether Plaintiff files grievances against other corrections officer, and Plaintiff doing so would not motivate DuFrane to treat Plaintiff one way or another. *Id.* at ¶ 53. DuFrane was never asked by any corrections official to plant evidence in Plaintiff's cell or file a false misbehavior report against him. *Id.* at ¶ 56. There is no evidence disputing DuFrane's statement that he was unaware of grievances previously filed by Plaintiff prior to conducting the cell search on November 29, 2012, and therefore was in no way influenced by such grievances in conducting the search or filing the Misbehavior Report. *Id.* at ¶ 54.

 **\*13** In summary, Plaintiff's grievances were protected First Amendment conduct, and planting evidence and issuing a false misbehavior report based on the evidence constitutes adverse action. However, in light of the absence of record evidence establishing that DuFrane engaged in the alleged adverse action, and the lack of specific facts showing that DuFrane acted in retaliation for Plaintiff's filing of grievances against other corrections officers, the Court recommends that DuFrane be granted summary judgment.

2. *Retaliation Claim Against Gagnon*

Plaintiff also claims that Gagnon was involved in planting evidence in his cell during the cell search, that he signed off on DuFrane's allegedly false Misbehavior Report against Plaintiff based upon the planted evidence, and that he endorsed the factually unsupported smuggling charge in retaliation for grievances Plaintiff had filed against Upstate staff. (Dkt. No. 1 at 24, 26, 42–43.) As with DuFrane, Plaintiff claims that Gagnon engaged in those acts in retaliation for Plaintiff's filing of grievances against other corrections officials prior to the November 29, 2012, cell search. (Dkt. No. 1 at 24, 26, 42–43.)

According to Gagnon, after being advised by DuFrane of the results of the search of Plaintiff's cell, he went to the cell and personally saw the sheets, or draglines, in the corner of Plaintiff's cell and the missing and loose screws in the steel plate. (Dkt. No. 40–4 at ¶¶ 12–14.) Gagnon signed off on the Misbehavior Report having personally seen the draglines and missing and loose screws. *Id.* at ¶ 24. Gagnon has admitted endorsing the charges, including the smuggling charge. *Id.* at ¶ 25. Gagnon has denied ever asking any corrections official to falsify a misbehavior report against Plaintiff. *Id.* at ¶ 37.

The record contains no evidence, admissible or otherwise, that Gagnon was involved in planting evidence in Plaintiff's cell or knowingly approving a Misbehavior Report based upon planted evidence. As with DuFrane, Plaintiff may not rely on his "conclusory allegations" to defeat summary judgment. *Jeffreys,* 426 F.3d at 554.

Even if Plaintiff had raised a material question of fact on the issue of adverse action, his retaliation claim against Gagnon, as with his claim against DuFrane, falters on the issue of causation. As discussed above, it is difficult to establish that a defendant had cause to retaliate against a plaintiff for filing a grievance against other corrections officers. *Wright,* 554 F.3d 255 at 274. Gagnon's statement that he was unaware of grievances filed by Plaintiff prior to the November 29, 2012, cell search is undisputed by record evidence. (Dkt. No. 40–4 at ¶ 39.) Plaintiff's claim that Gagnon was acting in retaliation is wholly conclusory which, as with DuFrane, is not enough to survive summary judgment. *See Flaherty,* 713 F.2d at 13 (claims of retaliation must be supported by specific facts).

In light of the foregoing, the Court recommends that summary judgment be granted in Gagnon's favor.

### 3. *Retaliation Claim Against Haug*

Plaintiff's submission of grievances against Haug was protected First Amendment conduct. However, even were the Court to assume for purposes of this motion that Haug's decision finding Plaintiff guilty on all charges and the penalty imposed by him constituted adverse action, Plaintiff has failed to raise a question of material fact on the issue of causation. According to Haug, he had no knowledge during the hearing that Plaintiff had submitted grievances against him. (Dkt. No. 40–8 at ¶¶ 31–33.) Moreover, according to Haug, the fact that a disgruntled inmate who is the subject of a disciplinary hearing before him files a grievance does not affect his impartiality or influence his decisions or the penalty imposed by him. *Id.* at ¶ 34. Haug claims to have relied upon the evidence in rendering his decision, and he contends that despite Prack's dismissal of the smuggling charge on appeal, it was reasonable for him to have found Plaintiff guilty on the charge based on the evidence. [11] *Id.* at ¶ 35.

**\*14** Plaintiff's submissions, albeit largely inadmissible, offer support for Haug's claim that he did not know Plaintiff had filed grievances against him during the hearing. According to Plaintiff, Sergeant Gravlin withheld Plaintiff's grievances against Haug from filing during the disciplinary hearing, and as of January 17, 2013, nearly two weeks after the hearing ended, Plaintiff had yet to receive grievance numbers or any acknowledgment of receipt of the grievances. (Dkt. No. 1 at 8, 13, 41.) Given Haug's denial and the absence of evidence showing that Haug had knowledge of the grievances at the time he rendered his decision and imposed penalty at the disciplinary hearing, no reasonable juror could conclude that a causal connection existed between Plaintiff's grievances against Haug and Haug's decision and penalty in the disciplinary hearing.

Therefore, the Court recommends that Defendant Haug be granted summary judgment. [12]

### D. Deliberate Indifference Claim Against Rock

Plaintiff claims that after receiving, reviewing, and responding to a number of complaints regarding staff misconduct submitted by Plaintiff, Rock failed or correct, or was deliberately indifferent to the misconduct. [13] (Dkt. No. 1 at 9–10, 13, 21, 26–29, and 41.) The now dismissed

Defendants alleged by Plaintiff to have committed constitutional violations to which Rock was allegedly indifferent included Sevey, Gravlin, and Demarse. [14] Plaintiff also claims indifference by Rock with regard to his claims against DuFrane, Gagnon, and Haug. *Id.* at 11–12, 28.

The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). "Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal,* 556 U.S. at 676. ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat* superior."). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis,* No. 9:11–CV–1317 (GTS/RFT), 2012 WL 651919, at *6, 2012 U.S. Dist. LEXIS 25367, at *22–23 (N.D.N.Y. Feb. 28, 2012) (citing *McKinnon,* 568 F.2d at 934); *see also Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (a "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections ... in a § 1983 claim" (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985)). Therefore, "a plaintiff must ... allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873. [15]

**15** Plaintiff's supervisory liability claim appears to fall within the second and fifth *Colon* categories. However, where as in this case a plaintiff "has not established any underlying constitutional violation, [he] cannot state a claim for § 1983 supervisor liability." *Elek v. Incorp. Vill. of Monroe,* 815 F.Supp.2d 801, 807–08 (S.D.N.Y.2011) (collecting cases); *see also Tompkins v. City of New York,* 50 F.Supp.3d 426, 434 (S.D.N.Y.2014) (same); *Vail v. Lashway,* No. 9:12–CV–1245 (GTS/RFT), 2014 WL 4626490, at * 20, 2014 U.S. Dist. LEXIS 129516, at * 50 (N.D.N.Y. Sept. 15, 2014) (same).

Plaintiff's underlying § 1983 claims against Sevey, Demarse, Gravlin, and all other originally named Defendants except DuFrane, Gagnon, and Haug, were dismissed for failure to state a claim on initial review. (Dkt. No. 10 at 50–51.) There is no evidence in the summary judgment record establishing that any of the original defendants dismissed from the case on initial review violated Plaintiff's constitutional rights. In addition, the Court is recommending summary judgment in DuFrane, Gagnon, and Haug's favor with respect to the retaliation claims remaining against them after initial review. If the District Court adopts this Court's recommendations, Plaintiff will also have failed to establish underlying constitutional violations against those Defendants. Therefore, the Court recommends that Rock be granted summary judgment on Plaintiff's supervisory liability claim.

**ACCORDINGLY** it is hereby

**RECOMMENDED** that Defendants' motion for summary (Dkt. No. 40) be **GRANTED**, and it is hereby

**ORDERED** that the Clerk provide Plaintiff with copies of all unpublished decisions cited herein in accordance with *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW***. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72.

Henson v. Gagnon, Not Reported in F.Supp.3d (2015)
Case 9:17-cv-00874-DNH-DEP    Document 32    Filed 08/06/18    Page 27 of 47
2015 WL 9809874

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

**\*16** Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

2015 WL 9809874

| | |
|---|---|
| Tabular or Graphical Material not displayable at this time. | Tabular or Graphical Material not displayable at this time. |
| Tabular or Graphical Material not displayable at this time. | Tabular or Graphical Material not displayable at this time. |
| Tabular or Graphical Material not displayable at this time. | Tabular or Graphical Material not displayable at this time. |
| Tabular or Graphical Material not displayable at this time. | Tabular or Graphical Material not displayable at this time. |
| Tabular or Graphical Material not displayable at this time. | Tabular or Graphical Material not displayable at this time. |
| Tabular or Graphical Material not displayable at this time. | Tabular or Graphical Material not displayable at this time. |
| Tabular or Graphical Material not displayable at this time. | Tabular or Graphical Material not displayable at this time. |
| Tabular or Graphical Material not displayable at this time. | Tabular or Graphical Material not displayable at this time. |
| Tabular or Graphical Material not displayable at this time. | Tabular or Graphical Material not displayable at this time. |
| Tabular or Graphical Material not displayable at this time. | Tabular or Graphical Material not displayable at this time. |
| Tabular or Graphical Material not displayable at this time. | Tabular or Graphical Material not displayable at this time. |
| Tabular or Graphical Material not displayable at this time. | Tabular or Graphical Material not displayable at this time. |
| Tabular or Graphical Material not displayable at this time. | Tabular or Graphical Material not displayable at this time. |
| Tabular or Graphical Material not displayable at this time. | Tabular or Graphical Material not displayable at this time. |
| Tabular or Graphical Material not displayable at this time. | Tabular or Graphical Material not displayable at this time. |
| Tabular or Graphical Material not displayable at this time. | Tabular or Graphical Material not displayable at this time. |

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

**\*17**  Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Henson v. Gagnon, Not Reported in F.Supp.3d (2015)
Case 9:17-cv-00874-DNH-DEP    Document 32    Filed 08/06/18    Page 30 of 47
2015 WL 9809874

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

Tabular or Graphical Material not displayable at this time.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 9809874

Footnotes

1    Edward Saldano was also initially named as a Plaintiff in the action. (Dkt. No. 1.) However, Saldano was dismissed from the action without prejudice early on for failing to comply with an order regarding payment of the filing fee. (Dkt.Nos.9–10.)

2    Because the paragraphs in Plaintiff's complaint are not numbered consecutively throughout the pleading, and there are instances of the same number being used for more than one paragraph, references to the complaint herein are to the page number assigned by the Court's CM/ECF electronic docketing system.

3    Plaintiff's claim that Gagnon and DuFrane conducted the November 29, 2012, search on his cell in retaliation for grievances filed by Plaintiff was dismissed by Judge Suddaby on initial review. (Dkt. No. 10 at 34–35.)

4    Plaintiff claims that Keleher perjured himself at the hearing. (Dkt. No. 1 at 6.)

5    Plaintiff has submitted a copy of the December 19, 2012, grievance in opposition to Defendants' motion for summary judgment. (Dkt. No. 43–1 at 5–7.) The grievance is not on the printout of closed grievances filed by Plaintiff that was submitted by Defendants. (Dkt. No. 40–5 at 24.) It is unclear from the certification of Jeffrey Hale accompanying the list and Declaration of Melissa A. Latino, Defendants' counsel, whether the list purports to contain all of the grievances filed by Plaintiff. *Id.* at 1–2 and 23. It would appear that it may not since Grievance No. UST–51144–13, challenging the inclusion of the smuggling charge by the Review Officer, which is annexed to the Declaration of Scott Woodward submitted by Defendants, is not on the closed grievances list. (Dkt. No. 40–7 at 6–9.)

6    Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam).

7    L.R. 7.1(a)(3) provides that *"The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* However, see *Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d. Cir.2004) ("[I]n determining whether the moving party has met its burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

8    Defendants have complied with L.R. 56.2 by providing Plaintiff with the requisite notice of the consequences of his failure to respond to their summary judgment motion. (Dkt. No. 40 at 4.)

9    28 U.S.C. § 1746 states that a statement of verification must be in "substantially" the same form as the statement set forth in § 1746(2), which reads "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct." Although Plaintiff's signature in his complaint is notarized, the complaint has not been verified under oath. (Dkt. No. 1 at 44.) A complaint cannot be considered as an affidavit where, although notarized, it was not verified under oath. *Inmates, Washington County Jail v. England,* 516 F.Supp. 132, 138 (E.D.Tenn.1980), *aff'd without opinion,* 659 F.2d 1081 (6th Cir.1981) (Table).

2015 WL 9809874

10    Under N.Y. Comp.Codes R. & Regs, tit 7., § 251–2.2, the review officer is required to review misbehavior reports, classify them as a Tier I, II, or III, and refer them to the appropriate disciplinary body for action. § 251–2.2(a)–(b). The review officer has the authority to dismiss any misbehavior report which fails to state a valid charge. § 251–2.2(c). In Grievance No. UST–51144–13, filed by Plaintiff on January 8, 2013, Plaintiff complained that the review officer should have dismissed the smuggling charge on the grounds that there was no basis for the charge in the Misbehavior Report issued by DuFrane. (Dkt. No. 40–7 at 6.) In the Grievance, Plaintiff placed responsibility for the erroneous Tier III designation of the Misbehavior Report issued by DuFrane on the reviewing officer's failure to dismiss the smuggling charge. *Id.* at 8.

11    Given the lack of evidence of causation, it is unnecessary for the Court to consider whether Haug's finding of guilt on the smuggling charge was reasonable based upon the evidence presented at the hearing.

12    Inasmuch as the Court is recommending that Haug be granted summary judgment, it finds it unnecessary to reach his qualified immunity argument.

13    Plaintiff also claims that Rock wrongfully denied his September 30, 2012, grievance against Sevey regarding his medical diet food tray. (Dkt. No. 1 at 21.) However, Plaintiff's medical diet claim against Sevey was dismissed on initial review. (Dkt. No. 10 at 19–20.)

14    Plaintiff has also claimed that Rock was deliberately indifferent to his complaints about the PIMS program but has provided no evidence of constitutional violation by any of the defendants with respect thereto.

15    The Second Circuit has expressly declined to determine whether *Iqbal* eliminated any of the *Colon* bases for liability. *See Grullon v. City of New Haven,* 720 F.3d 133, 139 (2d Cir.2013).

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 204494
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Bruce Henson, Plaintiff,

v.

Gagnon, Sergeant, Upstate Corr. Facility;
E. DuFrane, Corr. Officer, Upstate Corr.
Facility; D. Rock, Superintendent, Upstate
Corr. Facility; and Houge, Civilian, Hearing
Officer, Upstate Corr. Facility; Defendants.

9:13-CV-590 (GTS/TWD)
|
Signed 01/15/2016

**Attorneys and Law Firms**

Bruce Henson, 09-A-1436, Upstate Correctional Facility,
P.O. Box 2001, Malone, New York 12953, pro se.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, The Capitol, Melissa A. Latino, Esq.,
Assistant Attorney General, of Counsel, Albany, New
York 12224, for Defendants.

**DECISION and ORDER**

GLENN T. SUDDABY, Chief United States District
Judge

**\*1** Currently before the Court, in this *pro se* prisoner
civil rights action filed by Bruce Henson ("Plaintiff")
against the four above-captioned employees of the New
York State Department of Corrections and Community
Supervision ("Defendants") pursuant to 42 U.S.C. §
1983, are (1) Defendants' motion for summary judgment,

and (2) United States Magistrate Judge Thérèse Wiley
Dancks' Report-Recommendation recommending that
Defendants' motion be granted. (Dkt. Nos. 40, 50.)
None of the parties have filed objections to the
Report-Recommendation, and the deadline by which
to do so has expired. (*See generally* Docket Sheet.)
After carefully reviewing the relevant papers herein,
including Magistrate Judge Dancks' thorough Report-
Recommendation, the Court can find no clear-error in the
Report-Recommendation. [1] Magistrate Judge Dancks
employed the proper standards, accurately recited the
facts, and reasonably applied the law to those facts. As
a result, the Report-Recommendation is accepted and
adopted in its entirety for the reasons set forth therein,
and Defendant's motion is granted. To those reasons, the
Court would add only that Plaintiff was *twice* provided the
requisite Local Rule 56.2 notice. (Dkt. No. 40 at 4; Dkt.
No. 42, at 2.)

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Dancks' Report-
Recommendation (Dkt. No. 50) is **ACCEPTED** and
**ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary
judgment (Dkt. No. 40) is **GRANTED**; and it is further

**ORDERED** that, as the Court has adopted the Report-
Recommendation, Plaintiff's supervisory claims against
Defendant Rock are **DISMISSED**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. NO. 1) is
**DISMISSED** in its entirety and the Clerk of Court shall
enter judgment for Defendants and close this action.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 204494

---

Footnotes

1    When no objection is made to a report-recommendation, the Court subjects that report-recommendation to only a
     clear error review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear
     error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept
     the recommendation." *Id.*; *see also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at \*1 (S.D.N.Y. July 31, 1995)
     (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is
     made, so long as those sections are not facially erroneous.") (internal quotation marks omitted).

**Henson v. Gagnon, Not Reported in F.Supp.3d (2016)**

2016 WL 204494

---

**End of Document**                                        © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 5478431
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Cesar Mateo, Plaintiff,
v.
Mason Dawn, Family Services Coordinator,
Cheryl Morris, Director of Ministerial Family
and Volunteer Services, and Jean King, Deputy
Superintendent for Programs, all in their
personal and individual capacities, Defendants.

No. 14-CV-2620 (KMK)
|
Signed 09/28/2016

**Attorneys and Law Firms**

Cesar Mateo, Woodbourne, NY, Pro Se Plaintiff.

Kruti D. Dharia, Esq., Jeb Harben, Esq., State of New
York Office of the Attorney General, New York, NY,
Counsel for Defendants.

OPINION & ORDER

KENNETH M. KARAS, District Judge

*1 Plaintiff Cesar Mateo ("Plaintiff"), proceeding pro
se, filed the instant Second Amended Complaint (the
"SAC") against Defendants Dawn Mason, Cheryl Morris,
and Jean King (collectively, "Defendants"), alleging that
Defendants violated his rights under the Equal Protection
Clause by failing to properly process his lawfully obtained
marriage license and by disallowing him enrollment in
the Family Reunion Program (the "FRP"). [1] (See Second
Am. Compl. (Dkt. No. 35).) Defendants bring this Motion
for Judgment on the Pleadings (the "Motion") pursuant to
Federal Rule of Civil Procedure 12(c). (See First Mot. To
Dismiss the Second Am. Compl. (Dkt. No. 61).) For the
reasons below, the Court grants the Motion and dismisses
the SAC with prejudice.

I. Background

A. Factual Allegations

The following facts are based on the allegations in the
SAC, which are taken as true for purposes of the Motion.

On June 16, 2012, Plaintiff, while incarcerated at Sing
Correctional Facility, and his then-fiance attended a
marriage ceremony organized by Defendant Dawn Mason
("Mason"). (See Second Am. Compl. ¶¶ 9, 13.) Plaintiff
and his fiance presented a marriage license and obtained
the signatures of all necessary parties. (See id. ¶¶ 10, 13.)
While the other inmates participating in the ceremony
had obtained their marriage licenses from the Ossining
Town Clerk (where Sing Correctional Facility is located),
Plaintiff and his fiance obtained their marriage license
from the New York City Marriage Bureau. (See id. ¶¶ 10,
11.) At the end of the marriage ceremony, Mason collected
the completed marriage licenses to be sent to the town
clerk so that marriage certificates could be issued. (See
id. ¶ 16.) Plaintiff and his fiance informed Mason that
their marriage license would need to be sent to the New
York City Marriage Bureau, and their marriage license
contained instructions on the back to the same effect. (See
id. ¶ 15.) Mason, however, did not send Plaintiff's signed
marriage license to the New York City Marriage Bureau,
but instead sent it to the Ossining Town Clerk along with
the rest of the marriage licenses. (See id. ¶ 17.) Shortly
thereafter, the Ossining Town Clerk returned Plaintiff's
marriage license to Mason, saying it was not valid. (See
id. ¶ 18.) Mason returned the marriage license to Plaintiff's
fiance and attached the correspondence from the Ossining
Town Clerk indicating that the license was not valid. (See
id.) Mason also met with Plaintiff on one occasion and
verified that the marriage license had been mailed back
to Plaintiff's fiance and that she would need to contact
the New York City Marriage Bureau. (See id. ¶ 21.)
About two months later, Plaintiff learned that the other
inmates who had participated in the marriage ceremony
had received their marriage certificates from the Ossining
Town Clerk. (See id. ¶ 20.) Sometime in 2012, Plaintiff's
fiance obtained a marriage certificate from the New York
City Marriage Bureau certifying that Plaintiff and his wife
were married on June 16, 2012. (See id. ¶ 22.) Plaintiff
alleges that this course of conduct violated Plaintiff's
rights under the Equal Protection Clause because Mason
failed to return Plaintiff's marriage license to the issuing
agency, as she had done for his peers. (See id. ¶ 24.)

*2 In October 2012, Plaintiff was transferred to
Woodbourne Correctional Facility. (See id. ¶ 25.) In
January 2013, he applied to participate in the FRP,

2016 WL 5478431

which would allow him to consummate his marriage and visit with his relatives, and indicated on the FRP application that he was married. (*See id.* ¶ 25; *see also id.* at unnumbered 20.) Plaintiff's application was denied in May 2013 on the grounds that he had not completed a substance abuse program. (*See id.* ¶ 27.) Plaintiff filed an appeal of the denial of his FRP application, alleging that his peers were admitted to the FRP while they were on the waiting list for the substance abuse program, but before they completed or were enrolled in the program. (*See id.* ¶ 31; *see also id.* ¶ 29.) In January 2014, Defendant Cheryl Morris ("Morris") upheld the denial of Plaintiff's FRP application on the ground that he had misrepresented his marriage status. (*See id.* ¶ 31; *see also id.* at unnumbered 26.) Plaintiff alleges that Morris never requested a copy of his marriage certificate before determining that Plaintiff had falsely represented his marriage status. (*See id.* ¶ 33.) Plaintiff alleges that this conduct violated his rights under the Equal Protection Clause because other inmates were requested to produce a marriage certificate after applying for the FRP, and Morris treated Plaintiff differently in denying him the opportunity to consummate his marriage and visit his relatives. (*See id.*)

On March 14, 2014, Plaintiff obtained a copy of his marriage certificate from the New York City Marriage Bureau. (*See id.* ¶ 37; *see also id.* at unnumbered 21.) He included this certificate in his new application to the FRP, submitted on March 18, 2014. (*See id.* ¶¶ 36-37; *see also id.* at unnumbered 27.) Defendant Jean King ("King") responded to Plaintiff's application shortly thereafter, saying that Morris had already determined that Plaintiff's marriage license was invalid and that King was "in no way able to supersede that determination." (*See id.* ¶¶ 38-39; *see also id.* at unnumbered at 23.) Plaintiff alleges that this conduct violated his rights under the Equal Protection Clause because King allowed similarly situated couples with valid marriage certificates to participate in the FRP. (*See id.* ¶ 41.)

B. Procedural History

In his original complaint (the "Original Complaint"), filed on April 11, 2014, Plaintiff brought claims against Mason, Morris, and King, as well as Mary Ann Robert (the Ossining Town Clerk) and Jeff McKoy (the Deputy Commissioner of Program Services), alleging due process and equal protection violations arising from the same conduct identified in the SAC. (See Compl. (Dkt. No. 2).) Then-Chief Judge Loretta A. Preska issued an Order

to Amend on May 13, 2014 (the "Order to Amend"), dismissing Plaintiff's due process claims against Mason and Mary Ann Robert for failing to forward his marriage license to the New York City Marriage Bureau, dismissing Plaintiff's due process and equal protection claims against the remaining defendants for rejecting Plaintiff's first FRP application, and instructing Plaintiff to amend his complaint should he wish to include a claim under the Equal Protection Clause relating to the denial of his second FRP application. (*See* Order to Amend (Dkt. No. 5).)

On June 9, 2014, Plaintiff filed his amended complaint, naming only King as a defendant and alleging that King violated his rights under the Equal Protection Clause in denying his second FRP application. (*See* Am. Compl. (Dkt. No. 7).) Plaintiff also stated his belief that the difference in treatment arose from his history of filing lawsuits against officers of the correctional institutions where he has been housed. (*See id.* ¶ 23.) Following execution of service on December 9, 2014, (*see* Marshal's Process Receipt & Return of Service Executed (Dkt. No. 17)), Plaintiff filed a Motion for Preliminary Injunction, (*see* Pl.'s Mot. for Prelim. Inj. (Dkt. No. 19)). The injunction was denied as moot after King's counsel indicated that Plaintiff's marriage had been recognized by the New York State Department of Corrections and Community Supervision ("DOCCS"). (*See* Dkt. No. 28; *see also* Decl. of Robert F. Cunningham in Opp. to Pl.'s Mot. for a Prelim. Inj. (Dkt. No. 26).) Following a conference with the Court, Plaintiff filed the SAC on May 14, 2015. (*See* Dkt. No. 35.) Defendants thereafter moved under Federal Rule of Civil Procedure 12(c) for a judgment on the pleadings, (see Dkt. No. 61), arguing that Plaintiff's claims against Mason and Morris are barred by the Order to Amend, that Plaintiff fails to state a claim upon which relief can be granted, and that Defendants are protected by qualified immunity, (*see* Defs.' Mem. of Law in Supp. of Defs.' Mot. To Dismiss ("Defs.' Mem.") (Dkt. No. 62)). [2]

II. Discussion

A. Standard of Review

**\*3** "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is appropriate where material facts are

undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir. 1988). "[T]he standards for dismissal pursuant to Rule 12(c) are the same as for a dismissal pursuant to Rule 12(b) (6)." *Ideal Steel Supply Corp. v. Anza,* 652 F.3d 310, 324 (2d Cir. 2011). To survive a motion to dismiss under Rule 12(c), therefore, "a complaint must allege sufficient facts which, taken as true, state a plausible claim for relief." *Keiler v. Harlequin Enters. Ltd.,* 751 F.3d 64, 68 (2d Cir. 2014). In reviewing a complaint, the Court "accept[s] all factual allegations as true and draw[s] every reasonable inference from those facts in the plaintiff's favor." *In re Adderall XR Antitrust Litig.,* 754 F.3d 128, 133 (2d Cir. 2014) (internal quotation marks omitted). Moreover, along with the complaint itself, the Court "may consider ... any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies." *ASARCO LLC v. Goodwin,* 756 F.3d 191, 198 (2d Cir. 2014) (internal quotation marks omitted).

The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss," and by extension a Rule 12(c) motion for judgment on the pleadings, "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (second alteration in original) (citations omitted). Instead, the Supreme Court has emphasized that the "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.,* and that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563. A plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. But if a plaintiff has "not nudged [his] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed." *Id.; see also Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is

entitled to relief.' " (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))). Where, as here, the complaint was filed pro se, it must be construed liberally with "special solicitude" and interpreted to raise the strongest claims that it suggests. *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir. 2011) (internal quotation marks omitted).

### B. Analysis

#### 1. Effect of the Order to Amend

Defendants contend that in the Order to Amend, Judge Preska dismissed all claims against Mason and Morris, and granted Plaintiff leave to amend the Original Complaint only with respect to his allegations under the Equal Protection Clause related to the denial of his second FRP application. (*See* Defs.' Mem. 6-7.) Defendants argue that, accordingly, Plaintiff's claims against Mason and Morris, which were removed in the First Amended Complaint but revived in the SAC, should be dismissed. (*See id.*)

In the Order to Amend, Judge Preska dismissed Plaintiff's claim under the Due Process Clause regarding the failure of Mason and the Ossining Town Clerk to forward his marriage license to the New York City Marriage Bureau. (*See* Order to Amend 4-5.) Plaintiff had not alleged, and thus Judge Preska did not address, a claim against Mason under the Equal Protection Clause. In the SAC, by contrast, Plaintiff alleges that Mason "treated [him] differently from [his] peer inmates who obtained their marriage certificate[s] because Mason return [ed] their marriage license[s] to the[ ] issuing agency." (Second Am. Compl. ¶ 24.) And Plaintiff makes clear in the SAC that the basis for his claims is the Equal Protection Clause. (*See id.* ¶ 5.) Therefore, Defendants are incorrect in contending that the claim against Mason under the Equal Protection Clause has been dismissed.

**\*4** Less clear is whether Plaintiff was permitted to amend his complaint to include an equal protection claim against Mason given the limited scope of the Order to Amend. However, because the Court concludes below that Plaintiff has not stated a claim against Mason under the Equal Protection Clause, the Court declines to consider whether Plaintiff's inclusion of the claim in the SAC was impermissible.

Defendants are correct, however, that Plaintiff's equal protection claim against Morris should be dismissed. In the Order to Amend, Judge Preska held that "Plaintiff ... fail[ed] to state a claim that the denial of participation in the FRP violates his right to [e]qual [p]rotection." (Order to Amend 5.) Judge Preska pointed out that "Plaintiff ha[d] not alleged that his [first] application was denied because of his membership in a protected class, and there is no fundamental right to participate in FRP," (*id.*), and went on to hold that Plaintiff could not sustain a "class-of-one" equal protection claim because he did "not allege that he was treated differently from similarly situated prisoners who were unable to document a legal marriage," (*id.* at 6.) Judge Preska concluded that Plaintiff had failed "to state an [e]qual [p]rotection claim based on the denial of his first FRP application." (*Id.* at 6-7.) This claim has thus already been dismissed.

Even assuming Plaintiff was permitted to amend his complaint with regard to his equal protection claim against Morris, Judge Preska's finding that Plaintiff failed to state a claim is the law of the case and informs the outcome here. *See Fermin v. United States,* 859 F. Supp. 2d 590, 600 n.12 (S.D.N.Y. 2012) ("[W]hen a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case unless cogent and compelling reasons militate otherwise." (quoting *Johnson v. Holder,* 564 F.3d 95, 99 (2d Cir. 2009))); *Am. Hotel Int'l Grp., Inc. v. OneBeacon Ins. Co.,* 611 F. Supp. 2d 373, 378 (S.D.N.Y. 2009) ("Under the law of the case doctrine, 'a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation.' " (quoting *In re PCH Assocs.,* 949 F.2d 585, 592 (2d Cir. 1991))), *aff'd,* 374 Fed.Appx. 71 (2d Cir. 2010). Although Plaintiff has added more detail to his complaint, he has not alleged additional facts that would persuade this Court to veer from Judge Preska's determination that Plaintiff has failed to state an equal protection claim against Morris. (*Compare* Second Am. Compl. ¶¶ 26-34, *with* Compl. ¶¶ 26-33.) There are accordingly no grounds to revisit Judge Preska's determination, and Plaintiff's claim against Morris should be dismissed.

However, Judge Preska's holding was limited only to the first FRP application. She gave Plaintiff leave to file an amended complaint related to the second FRP application. (*See* Order to Amend 7.) Accordingly,

Plaintiff's claims against King relating to the second FRP application are properly before the Court and will be addressed below.

## 2. Equal Protection Claims

Defendants next contend that Plaintiff fails to state a claim upon which relief can be granted. (*See* Defs.' Mem. 8-10.) The SAC purports to make claims under the Equal Protection Clause, and the Court will construe Plaintiff's pleadings accordingly.

The Equal Protection Clause requires the government to treat all similarly situated persons alike. *See City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). While the Equal Protection Clause is typically invoked to bring lawsuits claiming discrimination based on membership in a protected class, where a plaintiff does not allege membership in a protected class, he may still prevail on a "class-of-one" theory of equal protection. *See Neilson v. D'Angelis,* 409 F.3d 100, 104 (2d Cir. 2005), *overruled on other grounds by Appel v. Spiridon,* 531 F.3d 138 (2d Cir. 2008) (per curiam). A class-of-one claim arises when a plaintiff claims that he was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000).

**\*5** In order to succeed on such a claim, the plaintiff must establish that:

> (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake.

*Analytical Diagnostic Labs, Inc. v. Kusel,* 626 F.3d 135, 140 (2d Cir. 2010) (quoting *Neilson,* 409 F.3d at 104). Class-of-one plaintiffs must show "an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Ruston v. Town Bd. for Town of Skaneateles,* 610 F.3d 55, 59 (2d Cir. 2010) (internal

quotation marks omitted). "Because of the particular posture of a 'class of one' claim, the comparator's circumstances must be 'prima facie identical.' " *Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills,* 815 F. Supp. 2d 679, 693 (S.D.N.Y. 2011) (quoting *Neilson,* 409 F.3d at 105). The comparison to similarly situated individuals should "provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate government policy that an improper purpose—whether personal or otherwise— is all but certain." *Neilson,* 409 F.3d at 105. "It is well established that this pleading standard is demanding." *Hampshire Recreation, LLC v. Village of Mamaroneck,* No. 14-CV-7228, 2016 WL 1181727, at *6 (S.D.N.Y. Mar. 25, 2016) (internal quotation marks omitted).

Plaintiff has not adequately alleged a class-of-one claim with respect to Mason because he has not alleged that any other inmates who obtained marriage licenses from New York City were treated differently. Plaintiff alleges, in fact, that all of his peer inmates obtained their marriage licenses from the Ossining Town Clerk, (*see* Second Am. Compl. ¶ 11), and that Mason mailed all of the marriage licenses to the Ossining Town Clerk, (*see id.* ¶ 16). Plaintiff attempts to identify a broader class of comparators, alleging that Mason returned the marriage licenses of his peer inmates "to the[ ] issuing agency where they purchased them," but failed to do so for Plaintiff. (*See id.* ¶ 17.) But plaintiffs seeking to make a class-of-one claim must show "an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Ruston,* 610 F.3d at 59 (internal quotation marks omitted). Plaintiff's comparison to his peer inmates is insufficiently specific; he does not allege that any of his peers obtained marriage licenses from anywhere other than Ossining, and thus the circumstances of Plaintiff and his peers are not "prima facie identical." *Mosdos,* 815 F. Supp. 2d at 693 (internal quotation marks omitted); *see also MB v. Islip Sch. Dist.,* No. 14-CV-4670, 2015 WL 3756075, at *10 (E.D.N.Y. June 16, 2015) ("[The] [p]laintiffs' conclusory statement that [the comparator] is ... similarly situated to [the claimant], without any supporting facts to suggest an extremely high degree of similarity between [the two] is insufficient to establish that no rational person could regard [the claimant's] circumstances to differ from those of [the comparator] to a degree that would justify the differential treatment." (alteration and internal quotation marks omitted)). Moreover, as Plaintiff admits, (*see* Second Am. Compl. ¶ 16), and

as the relevant DOCCS Directive provides, *see* New York State DOCCS Directive 4201 (Mar. 15, 2012), http://www.doccs.ny.gov/Directives/4201.pdf, Mason was under no obligation to accommodate Plaintiff's desire to have a marriage certificate issued by the New York City Marriage Bureau.[3] If anything, Mason's conduct in both mailing the marriage license to Plaintiff's fiance and meeting with Plaintiff to discuss the next necessary steps, (*see* Second Am. Compl. ¶¶ 19, 21), evinced a genuine effort to assist Plaintiff in finalizing his marriage. That Mason declined to take the additional step of sending the marriage license to the New York City Marriage Bureau herself, a service she provided for no other inmate, does not suffice to establish a class-of-one equal protection claim.

**\*6** Nor has Plaintiff stated a class-of-one equal protection claim against King. As Defendants note, (Defs.' Mem. 9-10), there is an initial question of whether class-of-one equal protection claims alleging differential treatment resulting from discretionary state action are viable after *Enquist v. Oregon Department of Agriculture,* 553 U.S. 591 (2008), and *Analytical Diagnostic,* 626 F.3d 135. In *Enquist,* the Supreme Court noted that "[t]here are some forms of state action ... which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments." 553 U.S. at 603. "In such cases the rule that people should be treated alike, under like circumstances and conditions is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted." *Id.* (internal quotation marks omitted). The Court went on to say that this principle applied "clearly in the employment context," and therefore held that "the class-of-one theory of equal protection ... is simply a poor fit in the public employment context." *Id.* at 604-05. The Court concluded that "the class-of-one theory of equal protection has no application in the public employment context." *Id.* at 607.

Shortly after *Enquist* was decided, some courts in the Second Circuit interpreted *Enquist* to hold that class-of-one equal protection claims were precluded for any government actions that were discretionary, regardless of whether the issue involved public employment. *See, e.g., Catcove Corp. v. Heaney,* 685 F. Supp. 2d 328, 333 (E.D.N.Y. 2010) ("[P]ost *Enquist,* a plaintiff who proceeds on a class of one claim must allege that the differential treatment resulted from non-discretionary

state action." (internal quotation marks omitted));
*DeFabio v. E. Hampton Union Free Sch. Dist.,* 658 F.
Supp. 2d 461, 495 (E.D.N.Y. 2009) (noting that *Engquist*
"appears to foreclose as a matter of law a 'class[ ]of[ ]one'
claim to the discretionary decisions" made by school
personnel), *aff'd,* 623 F.3d 71 (2d Cir. 2010); *Siao-Pao
v. Connolly,* 564 F. Supp. 2d 232, 245 (S.D.N.Y. 2008)
("[T]he Supreme Court ... limit[ed] class of one claims
in contexts characterized by individualized and subjective
determinations where allowing a challenge based on
the arbitrary singling out of a particular person would
undermine the very discretion that such state officials
are entrusted to exercise." (internal quotation marks
omitted)). But then the Second Circuit decided *Analytical
Diagnostic* and held that *"Engquist* does not bar all class-
of-one claims involving discretionary state action." 626
F.3d at 142. The court highlighted the distinction in
*Engquist* between "the government exercising the power
to regulate or license, as lawmaker, and the government
acting as proprietor, to manage its internal operations."
*Id.* (internal quotation marks omitted) (quoting *Engquist,*
553 U.S. at 598). The Second Circuit found persuasive
the reasoning of Judge Seybert in the Eastern District
of New York, who interpreted *Engquist* to prohibit only
those "discretionary decisions ... that involve discretion
that is actually exercised on a day-to-day basis, rather than
decisions that are theoretically discretionary but—as a
practical matter—actually depend on de facto standards."
*Id.* at 141 (internal quotation marks omitted) (quoting
*Alfaro v. Labrador,* No. 06-CV-1470, 2009 WL 2525128,
at *9 (E.D.N.Y. Aug. 14, 2009)).

The Second Circuit went on to hold that the plaintiff,
a private clinical testing laboratory that alleged that the
New York Department of Health maliciously subjected
the plaintiff to an "intense and unwarranted degree of
regulatory scrutiny" during inspections prior to revoking
the plaintiff's operating permit, was not barred from
bringing a class-of-one equal protection claim. *Id.* at
137-38, 142-43. The court reasoned that the New York
Department of Health "[did] not possess unfettered
discretion" in revoking or suspending existing operating
permits, and that the agency was required to "operate
within the regulatory framework set forth in [New York
law]." *Id.* at 142. The court concluded that "[e]specially
where the state is exercising its regulatory and licensing
power, we are loath to read *Engquist* as broadly as [the]
defendants urge." *Id.* at 142-43. "Accordingly, in the wake
of *Analytical Diagnostic,* class-of-one claims are not ipso

facto barred simply because the government's conduct was
discretionary." *Aliberti v. Town of Brookhaven,* 876 F.
Supp. 2d 153, 162 (E.D.N.Y. 2012) (italics omitted).

**\*7** Since *Analytical Diagnostic,* courts in the Second
Circuit have attempted to delineate between those claims
prohibited by *Engquist* (and *Analytical Diagnostic*) and
those claims left unaffected. *Compare Johnson v. Pallito,*
No. 12-CV-138, 2014 WL 2000369, at *3 (D. Vt.
Apr. 21, 2014)* ("Given that [the plaintiff's] employment
in a correctional facility is analogous to the public
employment at issue in *Engquist,* the holding of that case
controls here and bars [the plaintiff's] class-of-one equal
protection claim against [the defendant]."), *adopted by
2014 WL 1922728 (D. Vt. May 14, 2014),* and *Barnes
v. Abdullah,* No. 11-CV-8168, 2013 WL 3816586, at *6
(S.D.N.Y. July 22, 2013)* (dismissing a class-of-one claim
where "the conduct of [the defendants] in deciding which
inmates may participate in [drug rehabilitation programs]
is more akin to the state acting as a proprietor or employer
than as a regulator"), *with Aliberti,* 876 F. Supp. 2d at
163 ("[The] plaintiffs' claim is not barred by *Engquist*
because [the] plaintiffs were not government employees
and the [defendant] was exercising its regulatory power."),
and *Lexjac, LLC v. Incorporated Village of Muttontown,*
No. 07-CV-4614, 2011 WL 1059122, at *7 n.5 (E.D.N.Y.
Mar. 18, 2011)* ("Here, too, the [d]efendant did not
manage its internal relations so much as it exercised its
regulatory, plat-approving power. Thus, to the extent that
the *Analytical Diagnostic* ... court extended *Eng[q]uist*
outside of the employment context, that ruling does
not apply here."). In *Barnes,* the court held that a
prisoner could not bring a class-of-one claim based on his
removal from a drug rehabilitation program. *See 2013 WL
3816586, at *1, *6.* Finding that "the alleged differential
treatment ... resulted from state action that is within
the state's discretion," *id.* at *6,* the court reasoned that
"prison officials are vested with considerable discretion
concerning inmates' participation in prison programs such
as [the program at issue]," and that "the conduct of prison
officials in deciding which inmates may participate in such
programs is more akin to the state acting as a proprietor
or employer than as a regulator," *id.* The court therefore
concluded that the plaintiff was "unable to assert a class-
of-one [e]qual [p]rotection claim to challenge his removal
from the [drug rehabilitation] program." *Id.*

While the reasoning in *Barnes* is persuasive, the context
here yields a different result. In contrast to *Barnes,*

whatever discretion prison officials may have exercised in denying Plaintiff's first application to the FRP, King made clear in her denial of Plaintiff's application that she was not exercising her discretion, but, in fact, was "in no way able to supersede [Mason's] determination." (Second Am. Compl. at unnumbered 23.) Thus, King did not enjoy "considerable discretion," but instead was constrained by the procedures of which Plaintiff now complains. And even if admission to the FRP is "theoretically discretionary," "as a practical matter," admission in this circumstance was not a matter of discretion. *Analytical Diagnostic,* 626 F.3d at 141 (internal quotation marks omitted). Because King did not "possess unfettered discretion," *id.* at 142, *Engquist* does not bar Plaintiff's class-of-one equal protection claim against King related to her denial of Plaintiff's second application to the FRP. [4]

However, Plaintiff has again failed to identify similarly situated comparators sufficient to plead a class-of-one claim under the Equal Protection Clause. Plaintiff has not identified any inmates whose applications were denied by Morris and subsequently approved by King. Plaintiff only argues that King treated his peers differently in "allow[ing] them to participate in the FRP, process[ing] their application[s] and ... investigating their process and marriage legality." (Pl.'s Affirmation in Opp. to Defs.' Mot. To Dismiss ("Pl.'s Opp'n") ¶ 9 (Dkt No. 64).) As above, this generalized assertion of unequal treatment falls short of identifying "extremely" similar comparators as required by the law of the Second Circuit. *See Ruston,* 610 F.3d at 59 (internal quotation marks omitted). Plaintiff has therefore failed to state a claim against King under the Equal Protection Clause.

### 3. Retaliation Claim

In his opposition papers, Plaintiff suggests that the motivation for Defendants' alleged misconduct is Plaintiff's "history of filing complaints in court against their fellow employees." (Pl.'s Opp'n ¶ 10.) Although this allegation of retaliation was raised in Plaintiff's First Amended Complaint, (*see* Am. Compl. ¶ 23), Plaintiff removed it in the SAC, (*see generally* Second Am. Compl.). As Defendants point out, "a party is not entitled to amend its complaint through statements made in motion papers." *Shetiwy v. Midland Credit Mgmt.,* 980 F. Supp. 2d 461, 477 n.88 (S.D.N.Y. 2013) (internal quotation marks omitted) (quoting *Wright v. Ernst &*

*Young LLP,* 152 F.3d 169, 178 (2d Cir. 1998)); *see also LaFlamme v. Societe Air Fr.,* 702 F. Supp. 2d 136, 140 n.5 (E.D.N.Y. 2010) ("[T]he court declines to consider those documents submitted by [the] plaintiffs to support allegations first raised in their motion papers and found nowhere in the [c]omplaint."). Application of that rule is particularly apt here, where Plaintiff removed the allegation from an earlier amended complaint. And while Plaintiff is permitted to amend his complaint once as a matter of right, *see* Fed. R. Civ. P. 15(a)(1), and any time thereafter with leave of the court, *see id.* at 15(a)(2), Plaintiff has already amended his complaint twice, and his voluntary removal of the retaliation claim in the SAC militates against granting leave yet again to include allegations already raised and withdrawn.

**\*8** Even were the Court to entertain, however, Plaintiff's scattered allusions to a retaliatory motive on the part of Defendants, nothing in the SAC or in Plaintiff's opposition papers suffices to state a claim for retaliatory action in violation of the First Amendment. In order to survive a motion to dismiss, a plaintiff asserting a First Amendment retaliation claim must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks omitted). Courts are instructed to "approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official ... can be characterized as a constitutionally proscribed retaliatory act." *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir. 2003) (internal quotation marks omitted). Accordingly, First Amendment retaliation claims brought by prisoners must "be 'supported by specific and detailed factual allegations,' not stated 'in wholly conclusory terms.'" *Dolan v. Connolly,* 794 F.3d 290, 295 (2d Cir. 2015) (quoting *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002)).

Plaintiff's filing of lawsuits against prison officials is indisputably a protected First Amendment activity. *See Espinal,* 558 F.3d at 128-29; *see also Tirado v. Shutt,* No. 13-CV-2848, 2015 WL 4476027, at \*4 (S.D.N.Y. July 22, 2015) ("Inmates are ... protected when they file lawsuits against prison officials."); *Baskerville v. Blot,* 224 F.

Supp. 2d 723, 731 (S.D.N.Y. 2002) (same). In determining whether an adverse action has been taken against Plaintiff, the Court conducts an objective inquiry, asking whether the alleged conduct "would deter a similarly situated individual of ordinary firmness from exercising constitutional rights." *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir. 2004) (alteration and internal quotation marks omitted). It is unclear whether Defendants' conduct rises to such a level. Even assuming it does, however, Plaintiff has not alleged sufficient facts showing "a causal connection between the protected conduct and the adverse action." *Espinal,* 558 F.3d at 128 (internal quotation marks omitted).

Plaintiff's history of filing lawsuits against prison officials is well documented. *See, e.g., Mateo v. Bristow,* No. 12-CV-5052, 2015 WL 925933 (S.D.N.Y. Mar. 4, 2015); *Mateo v. Gundrum,* No. 10-CV-1103, 2013 WL 5464722 (N.D.N.Y. Sept. 30, 2013); *Mateo v. O'Connor,* No. 10-CV-8426, 2012 WL 1075830 (S.D.N.Y. Mar. 29, 2012); *Mateo v. Fischer,* 682 F. Supp. 2d 423 (S.D.N.Y. 2010). But none of the Defendants here was named as a defendant in any of those cases, and "[a]s a general matter, it is difficult to establish one defendant's retaliation for complaints against [ ]other defendant[s]." *Hare v. Hayden,* No. 09-CV-3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011); *see also Wright v. Goord,* 554 F.3d 255, 274 (2d Cir. 2009) (dismissing retaliation claim where "the only individual defendants named in the ... [c]omplaint were Goord, McDermott, and Dirie, none of whom was alleged to have participated in th[e] [retaliatory] event"); *Henson v. Gagnon,* No. 13-CV-590, 2015 WL 9809874, at *12 (N.D.N.Y. Dec. 10, 2015) ("The record is devoid of evidence ... that supports [the] [p]laintiff's conclusory assertion that [the defendant] planted evidence and issued the [m]isbehavior [r]eport based upon evidence in retaliation for grievances [the] [p]laintiff had filed against other corrections officers."), *adopted by* 2016 WL 204494 (N.D.N.Y. Jan. 15, 2016). Plaintiff's claim is similarly handicapped by its failure to allege or otherwise suggest that Defendants even knew of the complaints filed against other correction officers. *See Wesley v. Kalos,* No. 97-CV-1598, 1997 WL 767557, at *5 (S.D.N.Y. Dec. 11, 1997) ("To establish a claim of retaliatory transfer requires [the plaintiff], at a minimum, to assert facts to show that the [d]efendants knew of [the plaintiff's] complaints prior to the transfer."); *see also Alston v. Pafumi,* No. 09-CV-1978, 2016 WL 81785, at *7 (D. Conn. Jan. 7, 2016) (granting partial summary judgment where the plaintiff

identified "no record evidence from which a reasonable jury could infer that any other defendant was aware of [the plaintiff's] complaint"), *reconsideration denied,* 2016 WL 447423 (D. Conn. Feb. 4, 2016); *Tirado v. Shutt,* No. 13-CV-2848, 2015 WL 774982, at *10 (S.D.N.Y. Feb. 23, 2015) ("Absent evidence that any defendant knew about his ... grievance, [the plaintiff] has failed to provide any basis to believe that they retaliated against him for a grievance in which they were not named."), *adopted in relevant part by* 2015 WL 4476027 (S.D.N.Y. July 22, 2015). In light of the absence of any facts suggesting that Defendants were involved in the prior lawsuits, knew of the prior lawsuits, or had any involvement with defendants named in the prior lawsuits, Plaintiff has failed to establish a plausible causal connection between the filing of his prior lawsuits and the allegedly retaliatory actions taken here. *Cf. Olutosin v. Lee,* No. 14-CV-685, 2016 WL 2899275, at *11 (S.D.N.Y. May 16, 2016) (denying motion to dismiss retaliation claim where adverse actions occurred within ten months of the filing of the first lawsuit, one of the defendants in the prior lawsuit worked closely with named defendants in the current lawsuit, and one unnamed officer made a comment to the plaintiff regarding his earlier lawsuit). Thus, even construing Plaintiff's filings liberally, Plaintiff has failed to state a claim for retaliatory action in violation of his First Amendment rights. [5]

### 4. Dismissal With Prejudice

**\*9** Because this is Plaintiff's third attempt to plead a cause of action against Defendants, the Court dismisses the SAC with prejudice.

A complaint should be dismissed without prejudice if the pleading, " 'liberally read,' suggests that the plaintiff has a claim that [s]he has inadequately or inartfully pleaded and that [s]he should therefore be given a chance to reframe." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir. 2000) (alterations and citation omitted) (quoting *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 (2d Cir. 1999)). If a complaint, however, has substantive problems and "[a] better pleading will not cure [them]," "[s]uch a futile request to replead should be denied." *Id.* (citing *Hunt v. All. N. Am. Gov't Income Tr.,* 159 F.3d 723, 728 (2d Cir. 1998)). Even pro se plaintiffs are not entitled to file an amended complaint if the complaint "contains substantive problems such that an amended pleading

would be futile." *Lastra v. Barnes & Noble Bookstore,* No. 11-CV-2173, 2012 WL 12876, at *9 (S.D.N.Y. Jan. 3, 2012), aff'd, 523 Fed.Appx. 32 (2d Cir. 2013). Courts are especially wary of giving plaintiffs multiple "bites at the apple" where a plaintiff has already been granted leave to amend. *See Anthony v. Brockway,* No. 15-CV-451, 2015 WL 5773402, at *3 (N.D.N.Y. Sept. 30, 2015) ( [The] [p]laintiff has already been given one opportunity to amend his complaint ..., and there is nothing in his second amended complaint suggesting that [he] could do better given another opportunity."); *Al-Qadaffi v. Servs. for the Underserved (SUS),* No. 13-CV-8193, 2015 WL 585801, at *8 (S.D.N.Y. Jan. 30, 2015) (denying leave to amend where "[the plaintiff] has already had one chance to amend his [c]omplaint, and there is still no indication that a valid claim might be stated if given a second chance"), aff'd, 632 Fed.Appx. 31 (2d Cir. 2016); *Bui v. Indus. Enters. of Am., Inc.,* 594 F. Supp. 2d 364, 373 (S.D.N.Y. 2009) (dismissing an amended complaint with prejudice where the plaintiff failed to cure the deficiencies identified in his initial complaint despite "being given ample opportunity to do so").

Here, Plaintiff is on his third complaint The Original Complaint was dismissed on all grounds by Judge Preska, with leave to amend in a limited respect. (*See* Order to Amend.) Plaintiff did so, (*see* Am. Compl.), but after reviewing the grounds for Defendants' proposed Motion To Dismiss. (*see* Letter from Kruti Dharia, Esq., to Court (Feb. 26, 2015) (Dkt. No. 29)), Plaintiff opted to file a third complaint, attempting to cure the deficiencies identified by Defendants, (*see* Second Am. Compl.). At no point in these pleadings has Plaintiff successfully stated a claim for relief. And Plaintiff's failure to do so is not a consequence of inartful pleading or lack of legal acumen; rather, Plaintiff's claims lack substance in the law. Indeed, the SAC is detailed in its factual allegations, and provides documentary support for many of Plaintiff's allegations. There is little question that Plaintiff has presented the Court with all of the facts pertinent to his claims, yet even construing Plaintiff's pleadings liberally, Plaintiff has failed again to state a claim. Accordingly, the dismissal of the SAC is with prejudice.

### III. Conclusion

**\*10** For the foregoing reasons, the Motion is granted with prejudice. The Clerk of the Court is respectfully requested to terminate the pending Motion (Dkt. No. 61) and close the case.

SO ORDERED.

DATED: September 28, 2016.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 5478431

---

Footnotes

1   The SAC lists the first Defendant as "Mason Dawn," (see Second Am. Compl. (Dkt. No. 35)), but Defendants refer to her as "Dawn Mason," (*see* Defs.' Mem. in Supp. of Defs.' Mot. To Dismiss (Dkt. No. 62)), and Plaintiff appears to adopt that nomenclature, (see Pl.'s Affirmation in Opp'n to Defs.' Mot. To Dismiss (Dkt. No. 64)). The Court will do the same.

2   Although motions under Federal Rule of Civil Procedure 12(c) are termed "Motion[s] for Judgment on the Pleadings," *see* Fed. R. Civ. P. 12(c), Defendants have titled their moving papers "Motion To Dismiss." (*see* Dkt Nos. 61, 62, 65). This imprecision in terminology is immaterial for purposes of resolving the Motion.

3   That directive provides that "[t]he Offender Rehabilitation Coordinator shall conduct an initial interview with the inmate to explain the entire marriage procedure emphasizing that while [DOCCS] will assist the inmate, the primary responsibility for making all arrangements and securing the necessary documents rests with the inmate and the intended spouse." New York State DOCCS Directive 4201, ¶ IV.B.1 (Mar. 15, 2012), http://www.doccs.ny.gov/Directives/4201.pdf.

4   By contrast, Morris's decision to deny Plaintiff's first FRP application was arguably discretionary, and thus may be barred by *Enquist* and *Analytical Diagnostic.* However, as set forth above, that claim has already been dismissed by Judge Preska. (*See* Order to Amend 6-7).

5   As Plaintiff has failed to state a claim against any of Defendants, the Court declines to address whether Defendants are entitled to qualified immunity.

---

2003 WL 22299359
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Troy GARRETT, Plaintiff,

v.

Edward REYNOLDS, Superintendent,
Mohawk Corr. Facility; James A. Mance,
Deputy Superintendent of Programs; John

O'Reilly, [1] Deputy Superintendent; J.
Burge, First Deputy; M. Maher, DSS; R.
Centore, Correctional Officer, Defendants.

No. Civ.9:99CV2065NAMGLS.
|
Oct. 7, 2003.

**Attorneys and Law Firms**

Troy Garrett, Peekskill, NY, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General State of New York,
Syracuse, NY, for the Defendants.

Maria Moran, Asst. Attorney General, of counsel.

*REPORT-RECOMMENDATION*

SHARPE, Magistrate J.

I. *Introduction* [2]

**\*1** Plaintiff, *pro se* Troy Garrett filed an action under
42 U.S.C. § 1983 claiming that the defendants violated
his civil rights when they retaliated against him for his
activities as an IGRC representative by subjecting him
to verbal harassment, physical abuse and subsequently,
a transfer. Garrett also claims that the supervisory
defendants failed to properly investigate his complaints
and failed to train/supervise their employees. This court
recommends denying the motion for summary judgment
in part and granting it in part.

II. *Procedural History*

On July 13, 2001, Garrett filed an amended complaint
against the defendants claiming that they violated his
civil rights under the First, Sixth Eighth, and Fourteenth
Amendments. [3] On September 28, 2001, the defendants
filed a motion for summary judgment. On January 18,
2002, this court issued an order informing Garrett of
his obligation to file a response and extended his time
to respond for thirty days. On April 24, 2002, this
court granted an additional sixty days to respond to the
defendants' motion. Despite having been given multiple
opportunities to respond, Garrett has failed to file a
response.

III. *Facts* [4]

On June 17, 1999, Garrett filed a grievance against Officer
Kelley for verbal harassment. [5] This grievance was denied
by the Central Office Review Committee (CORC) on July
21, 1999. On March 19, 2000, Garrett filed a grievance
claiming that defendant Burge used intimidation tactics.
Defendant Reynolds investigated the grievance and it was
denied based on a finding that no harassment occurred.
Garrett appealed to the CORC and they denied the
grievance on April 5, 2000. On April 10, 2000, defendant
Centore wrote a misbehavior report against Garrett for
creating a disturbance and employee harassment. On
April 12, 2000, Lieutenant Manell presided over Garrett's
Tier 2 disciplinary hearing and he was found guilty of both
charges. He was given a 21 day recreation penalty, and
loss of packages and commissary. However, his recreation
penalty was suspended and deferred. Garrett appealed the
determination and it was affirmed on April 19, 2000.

On April 17, 2000, Garrett filed a grievance against
Centore for harassment. Burge denied his grievance on
May 4, 2000, and subsequently, the CORC denied it. On
May 12, 2000, Garrett sent a letter to Burge concerning
further harassment by Centore. On May 16, 2000, Garrett
filed another grievance against Centore for harassment.
His grievance was denied on May 26, 2000. After Garrett
appealed, his grievance was again denied by the CORC.
On June 22, 2000, the Superintendent's Office received a
letter from Garrett alleging that Centore threw a piece of
paper with a picture of a plunger and the words "always
gets the job done" into his cell. He wrote a grievance
against Centore for harassment due to the paper that
he threw into his cell. Burge forwarded the grievance to

the CORC on August 10, 2000. The CORC accepted the grievance on August 30, 2000, in order to investigate.

**\*2** On June 23, 2000, the Inspector General's Office interviewed Garrett at the Mohawk Correctional Facility regarding his complaints of Centore. That same day, Captain Naughton filed an administrative segregation recommendation. On June 29, 2000, an administrative segregation hearing was held. On July 14, 2000, Garrett was transferred [6] to the Mid-State Correctional Facility.

Finally, Garrett filed a claim alleging that his property was lost or damaged on October 8, 1999. However, he was paid $75.00 for this claim and he signed a release on December 13, 1999.

## IV. *Discussion*

### A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999). "When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of the ... pleading, but the adverse party's response, by affidavits or as otherwise provided in [Federal Rule of Civil Procedure 56(e) ], must set forth specific facts showing that there is a genuine issue for trial." *St. Pierre v. Dyer,* 208 F.3d 394, 404 (2d Cir.2000). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Rexford Holdings, Inc. v. Biderman,* 21 F.3d 522, 525 (2d Cir.1994)(alternation in original) (citation omitted). However, it is well settled that on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999).

Furthermore, in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520 (1972); *see Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)(a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest"). Indeed, the Second Circuit has stated that "[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990); *see LaFond v. General Physics Serv. Corp.,* 50 F.3d 165, 171 (2d Cir.1995).

**\*3** This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, at \*2 (S.D.N.Y. May 16, 2001). More specifically, Local Rule 7.1(a)(3) of this court specifically provides that "any facts set forth in the [moving party's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." Local Rule 7.1(a)(3) further requires that the "non-movant shall file a Statement of Material Fact which mirrors the movant's statement in matching numbered paragraphs and which set forth a specific reference to the record where the material fact is alleged to arise." The courts of the Northern District have adhered to a strict application of Local Rule 7.1(a)(3)'s requirement on summary judgment motions. *Giguere v. Racicot,* 00-CV-1178, 2002 WL 368534, at \*2 (N.D.N.Y. March 1, 2002)(interalia citing *Bundy Am. Corp. v. K-Z Rental Leasing, Inc.,* 00-CV-260, 2001 WL 237218, at \*1 (N.D.N.Y. March 9, 2001)).

Furthermore, this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute. *Amnesty America v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002). As long as the local rules impose a requirement that parties provide specific record citations in support of their statement of

material facts, the court may grant summary judgment on that basis. *Id.* at 470-71.

In this case, Garrett did not file a response to the motion for summary judgment. Consequently, this court will accept the properly supported facts contained in the defendants' 7.1 Statement (*Dkt. No. 49* ) as true for purposes of this motion. [7] With this standard in mind, the court now turns to the sufficiency of Garrett's claims.

### B. *Eleventh Amendment*

In Garrett's complaint, he raises claims against the defendants in their official and individual capacity. The Eleventh Amendment provides that: "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. Although the Amendment does not specifically prohibit suits against a state by its own citizens, the Supreme Court has consistently applied that immunity to such cases. *See Burnette v. Carothers,* 192 F.3d 52, 57 (2d Cir.1999)(citing *Edelman v. Jordan,* 415 U.S. 651, 662-63 (1974)). Moreover, it is well established that Eleventh Amendment immunity applies not only when a state is a named defendant, but when liability must be paid from state coffers. *See New York City Health & Hosp. Corp. v. Perales,* 50 F.3d 129, 134 (2d Cir.1995)(citing *Edelman,* 415 U .S. at 665); *Dawkins v. State of New York,* 93-CV-1298, 1996 WL 156764, at *2 (N.D.N.Y. Mar. 28, 1996).

**\*4** In this case, Garrett raises claims against the defendants in their official and individual capacities. Since the Eleventh Amendment bars official capacity claims against these state officers, this court recommends dismissal of Garrett's claims against the defendants in their official capacity.

### C. *Retaliation*

In this case, Garrett claims that during the course of his appointment as an IGRC representative, he has been subjected to repeated acts of harassment, both verbal and physical, threatened with physical assaults, placed into disciplinary confinement in the SHU, and transferred. [8] The Second Circuit has held that retaliation against a prisoner for pursuing a grievance is actionable under §

1983. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). Moreover, the Second Circuit has recognized both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated. Thus, prisoners' claims of retaliation are examined with skepticism and particular care. *See Flaherty v. Coughlin,* 713 F.2d 10 (2d Cir.1983).

In order for a plaintiff to prevail on a First Amendment retaliation claim, a plaintiff must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected; (2) that the defendant took adverse action against the plaintiff; and, (3) that there was a causal connection between the protected speech and the adverse action. *See Dawes v. Walker,* [9] 239 F.3d 489, 492 (2d Cir.2001) (citation omitted) *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). If Garrett makes these showings, DOCS may evade liability if it demonstrates that it would have disciplined or transferred him " 'even in the absence of the protected conduct." ' *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted).

An inmate has a constitutional right to be protected from retaliation based upon his activities as an IGRC representative. *Alnutt v. Cleary,* 913 F.Supp. 160, 170 (W.D.N.Y.1996). However, a claim brought under "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Gill v. Hoadley,* 261 F.Supp 2d 113, 129 (N.D.N.Y.2003)(citing *Alnutt,* 913 F.Supp at 165-66)). Ordinarily, a claim for verbal harassment is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Picco,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Moreover, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Aziz Zarif Shabazz,* 994 F.Supp. at 474.

In this case, Garrett claims that defendant Centore harassed him for his activities as an IGRC representative. Garrett also claims that he was removed as an IGRC representative when he was transferred. In addition, Garrett claims that defendants Reynolds, Mance, Burger and Maher failed to properly investigate his allegations against Centore. Garrett claims that these defendants

failed to properly investigate his claims in retaliation for his activities as an IGRC representative.

**\*5** More specifically, Garrett claims that Reynolds and Mance recalled IGRC passes for one day in order to interfere with an investigation inquiry into a correctional officer's conduct involving inmates who were left in the yard during inclement weather. Finally, Garrett claims that his property was destroyed while he was in the SHU. [10] Garrett filed grievances against Centore in April, May, and June of 2000. One of his complaints involved Centore throwing a folded piece of paper into his cell which had a picture of a plunger with the words "always gets the job done" on it. On June 23, 2000, he was placed in administrative segregation in the SHU. Three weeks later he was transferred. [11]

Viewing the facts in the light most favorable to Garrett, the non-moving party, this court cannot, as a matter of law, find that Garrett fails to state a claim for which relief can be granted. He claims that he was retaliated against for his activities as an IGRC representative. As noted, verbal harassment alone will not constitute a violation of a prisoner's constitutional rights but in this case, it appears that he was transferred for his activities as an IGRC representative. The defendants rely on numerous grievances which were denied by the CORC to show that their actions were proper. They also claim that Garrett has failed to show injury, however, at this juncture of the litigation with virtually no discovery in this case, this court cannot recommend dismissal as a matter of law.

D. *Personal Involvement*

It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)(*citation omitted*). Since there is no respondeat superior liability, the defendant must be shown to have personal involvement in the alleged deprivation of rights. *Al-Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). Supervisory officials cannot be held liable under § 1983 solely for the acts of their subordinates. *See Monell v. Department of Social Serv.,* 436 U.S. 658, 690-695 (2d Cir.1978). However, a supervisory official can be held liable for constitutional violations if he or she: (1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal;

(3) created a custom or policy fostering the violation after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

Garrett contends that defendants Reynolds and Mance allowed staff members under their supervision to violate his rights. More specifically, Mance refused to properly investigate Garrett's complaints. Garrett also claims that defendant Burge refused to grant his request for redress against defendant Centore. Finally, Garrett claims that the defendants collectively failed to properly train and supervise their employees.

**\*6** The defendants contend that the claims against the supervisory defendants should be dismissed for lack of personal involvement. However, this court finds this contention without merit since it appears that all of the defendants were involved in the investigation process of Garrett's complaint and he accuses all of them of continuing the alleged constitutional violation by failing to properly investigate the grievances he filed. Accordingly, this court recommends denying the defendants' motion for summary judgment based on the lack of personal involvement.

WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that Garrett's claims against the defendants in their official capacity under the Eleventh Amendment should be dismissed since these claims are barred; and it is further

RECOMMENDED, that defendant O'Reilly be dismissed since he was never served; and it is further

RECOMMENDED, that the defendants' motion for summary judgment be denied in all other respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS

Case 9:17-cv-00874-DNH-DEP     Document 32     Filed 08/06/18     Page 47 of 47
**Garrett v. Reynolds, Not Reported in F.Supp.2d (2003)**
2003 WL 22299359

REPORT WILL PRECLUDE APPELLATE REVIEW.
*Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 22299359

---

Footnotes

1   In this case, the defendants maintain and the docket confirms that defendant John O'Reilly has never been served. Service must be made upon a defendant within 120 days of filing the complaint or any claims against that defendant will be dismissed. See Fed.R.Civ.P. 4(m). The original complaint, which named O'Reilly, was filed on November 26, 1999, and the amended complaint was filed on July 13, 2001. However, O'Reilly was never served. Since this defendant has never been served, this court lacks jurisdiction over him, and this court recommends the dismissal of this defendant.

2   This matter was referred to the undersigned for a Report-Recommendation by the Hon. Norman A. Mordue, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c).

3   Although Garrett claims to be raising violations under the Sixth, Eighth, and Fourteenth Amendments, the only viable claim based on this court's interpretation of the complaint is under the First Amendment for retaliation.

4   The facts are taken from the defendants' statement of undisputed material facts since Garrett failed to file a response.

5   Not a party in this suit.

6   The defendants suggest that Garrett has failed to exhaust his administrative remedies concerning his transfer. They claim that he agreed to the transfer and participated in the administrative hearing which resulted in his transfer. The issue of transfer will not be addressed in this Report-Recommendation because the court has insufficient information to determine whether he exhausted his remedies.

7   The court notes that this does not apply to the various conclusions of law contained in the defendants' 7.1 Statement.

8   This case turns on the interpretation of the complaint. Garret's complaint is not a model of clarity and as noted, he has failed to file a response to the motion for summary judgment. Nonetheless, a careful reading of Garrett's opening paragraph under the title "Facts" compels this court to interpret this complaint as one claiming retaliation for his activities and status as an IGRC representative.

9   Dawes' complaint was dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

10  However, the defendants provide the court with documents which show that he was paid $75.00 in settlement of this claim.

11  The defendants maintain that Garrett failed to exhaust this claim. At this juncture, it is unclear whether or not he exhausted this claim. As such, this court cannot, as a matter of law, recommend dismissal because the court has insufficient information to determine this issue.

---

**End of Document**                                      © 2018 Thomson Reuters. No claim to original U.S. Government Works.